HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
NITOJ P. SINGH (SBN: 265005)
nsingh@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Second Measure, Inc., Michael Babineau,
and Lillian Chou

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| SECOND MEASURE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN KIM, an individual,<br><br>Defendant,<br><br>AND RELATED COUNTERCLAIMS. | Case Number: 3:15-CV-03395-JCS<br><br>**PLAINTIFFS AND COUNTERCLAIM DEFENDANTS SECOND MEASURE INC., MICHAEL BABINEAU, AND LILLIAN CHOU'S TRIAL BRIEF**<br><br>Pretrial Conference: May 19, 2017<br>Trial Date: June 1, 2017<br><br>Judge: Hon. Joseph C. Spero<br>Courtroom: G, 15th Floor |



Second Measure Parties' Trial Brief                               Case No. 3:15-CV-03395

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................................... 3

   A.   The Parties ..................................................................................................................... 3

   B.   The Parties Contemplate Forming a Business ............................................................... 3

   C.   Mr. Kim Discontinues Any Involvement in the Business Evaluation ........................... 5

   D.   Mr. Babineau and Ms. Chou Form Second Measure ..................................................... 8

   E.   Mr. Kim Is Invited to Consult ........................................................................................ 9

III.  LEGAL ANALYSIS .............................................................................................................. 9

   A.   The Parties Did Not Form A Partnership ...................................................................... 9

   B.   Partners to an At-Will Partnership May Terminate the Partnership and Compete ..... 11

   C.   Mr. Kim Does Not Have Any Damages Or A Right To Equitable Relief .................. 12

   D.   Mr. Kim Did Breach His Consulting Agreement With Second Measure ................... 15

IV.  CONCLUSION .................................................................................................................... 15



# TABLE OF AUTHORITIES

**Cases**

*Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1101 (E.D. Cal. 2010) ................ 15

*Brockman v. Lane*, 103 Cal. App. 2nd 802 (1951) ................................................................................ 10

*Communist Party v. 522 Valencia, Inc.*, 35 Cal.App.4th 980, 990 (1995) ........................................... 14

*Fischer v. Carey*, 173 Cal. 185 (1916) .................................................................................................. 10

*Heckmann v. Ahmanson*, 168 Cal.App.3d 119, 136 (1985) .................................................................. 14

*Holmes v. Lerner*, 74 Cal. App. 4th 442, 453-54 (1999) ...................................................................... 10

*Holmes v. Lerner*, 74 Cal. App. 4th 442, 458 (1999) ............................................................................ 13

*Lyon v. MacQuarrie*, 46 Cal. App. 2d 119, 125-26 (1941) ................................................................... 13

*Miller v. Hall*, 65 Cal. App. 2d 200, 204 (1944) ................................................................................... 11

*Stodd v. Goldberger*, 73 Cal. App. 3d 827, 836 (1977) ........................................................................ 10

*Watterson v. Knapp*, 35 Cal.App.2d 283, 287 (1939) ........................................................................... 10

*Weiner v. Fleischman*, 54 Cal. 3d 476 (1991) ...................................................................................... 13

*Wheeler v. Farmer*, 38 Cal. 203, 213 (1869) ........................................................................................ 10

*Zeibak v. Nasser*, 12 Cal.2d 1, 12 (1938) .............................................................................................. 10

**Statutes**

Cal. Bus. & Prof. Code § 16600 ............................................................................................................. 11

Cal. Bus. & Prof. Code § 16602 ............................................................................................................. 11

Cal. Civ. Code § 2223 ............................................................................................................................. 14

Cal. Civ. Code § 2224 ............................................................................................................................. 14

Cal. Corp. Code § 16202 ........................................................................................................................ 10

Cal. Corp. Code § 16401 ........................................................................................................................ 13

Cal. Corp. Code § 16404 ........................................................................................................................ 12

Cal. Corp. Code § 16801 ........................................................................................................................ 11

**Treatises**

9 Witkin Summary of California Law 10th (2005) Partnerships ........................................................... 10

California Jurisprudence 3rd, Partnership, 48 Cal.Jur.3d Partnership § 135 ........................................ 11



Plaintiff and Counterclaim Defendant Second Measure, Inc. ("Second Measure" or the "Company"), and Counterclaim Defendants and Counterclaimants Michael Babineau ("Mr. Babineau"), and Lillian Chou ("Ms. Chou"), respectfully submit this Trial Brief in advance of the May 19, 2017 Pretrial Conference, and in relation to the June 2017 trial in this matter.

## I. INTRODUCTION

This is partnership dispute where no partnership was actually formed. Simply, Mr. Babineau, Ms. Chou, and Mr. Kim collaborated together from approximately September 2013 to September 2014, to see if a business could be formed around an idea they first learned of from a third-party—Zafar Jafri ("Mr. Jafri"). That idea, generally, was to take consumer spending data, in the form of credit card and bank card transactions, and see if they could develop a proof of concept demonstrating that the data could be used by investors to make better investment decisions in some way. They named their collaboration "Project Recon" or just "Recon."[1]

During the Recon period, the parties collaborated towards the development of the proof of concept, with no expectation that they could extract any revenue from the project. Indeed, as this was a simple evaluation, the terms under which they obtained the data did not allow them to commercialize their collaboration in any respect—they were only permitted to report back to the data provider with their findings.

Ultimately, the collaboration efforts fell apart for multiple reasons. First, the data provider was unwilling to come to any commercial agreement with the Recon team so long as Mr. Kim worked for a hedge fund, on account of the inherent conflicts. At the time, Mr. Kim worked for Surveyor Capital ("Surveyor"), a company that used the same data. Additionally, if an actual business was to be formed around the data, that business would help other funds compete against Surveyor. Mr. Kim acknowledged these conflicts in multiple communications, but refused to give up his employment with Surveyor.

---

[1] While Mr. Kim goes through great pains to refer to the collaboration as "Second Measure," even inserting "Second Measure" in place of "Recon" in quoted materials presented to the Court, the "Second Measure" name was only actually used in relation to Second Measure, Inc. While the parties did discuss using "Second Measure" as a possible name along with dozens of other names, the parties only actually called their collaboration "Project Recon" or "Recon."

1

Second Measure Parties' Trial Brief                                                                 Case No. 3:15-CV-03395

Second, during the September 2014 period, the parties had a falling out. This falling out was caused by Mr. Kim failing to perform as requested during the collaboration, failing to confirm to Mr. Babineau that he would actually be able to work on a business based on the data despite his conflicting ethical obligations to Surveyor, Mr. Kim ultimately seeking to exclude Ms. Chou from the collaboration, and demanding that all further efforts towards Project Recon be terminated. While Mr. Babineau and Ms. Chou had tried to work through the earlier issues with Mr. Kim, Mr. Babineau and Ms. Chou decided to fully separate from Mr. Kim at this point. While Mr. Kim attempts to frame this separation as Mr. Babineau seizing Recon's business opportunities, the evidence is clear that it was Mr. Kim's conduct that precipitated the break, and that there were no existing business opportunities for Recon. Indeed, the data provider made clear that Recon could not pursue commercial opportunities with its data, and would not permit the same while Mr. Kim was involved with the project.

Thereafter, Mr. Babineau and Ms. Chou started anew. They set aside all previous source code and concepts developed, and started from scratch. Their separate project ultimately evolved into Second Measure, Inc. Mr. Kim will not be able to prove that Second Measure used any code, materials, or work product from the Recon period. During Second Measure's development, Mr. Babineau and Ms. Chou invited Mr. Kim to serve as a consultant to Second Measure, to which he readily agreed. Ultimately, the parties agreed that Mr. Kim would be compensated though an equity grant, vested over time, with 2% earned up front, and 8% earned over the next four years. This agreement demonstrated that Mr. Kim acknowledged that he had no interest in Second Measure, and was willing to earn his way in to the Company. However, as Mr. Kim breached the consulting agreement and never performed, he never earned any equity interest in Second Measure.

Later, Mr. Kim apparently had a change of heart and began to threaten Second Measure with legal action, demanding 50% of the Company. This was simply a greed attempt by Mr. Kim to cash in on the fruits of his former friends' labor. Second Measure then initiated this Action to resolve this dispute.

///

///



## II. STATEMENT OF FACTS

### A. The Parties

Second Measure is a young startup company, based in the San Francisco Bay Area, incorporated in January 2015 by Mr. Babineau and Ms. Chou to build tools and services designed to leverage consumer spending data for the ultimate benefit of hedge funds and other large investors. Mr. Babineau and Ms. Chou are software engineering and data analytics experts who employ their expertise to make Second Measure's offerings possible.

Mr. Kim resides in Dallas, Texas and is an investment analyst working for Surveyor. By this Action, Mr. Kim demands significant sums from Second Measure even though he did not write any of the computer code that makes Second Measure's products and services possible, did not provide any design or engineering input on Second Measure's products and services, and has not shared any significant technical or business contributions with Mr. Babineau and Ms. Chou in relation to any enterprise for almost three years. Mr. Kim apparently claims he is entitled to compensation equaling half of the value of the Company because he allegedly brought an idea to Mr. Babineau nearly four years ago, and believes that idea matured into Second Measure. However, it is clear that Mr. Kim has not contributed even marginally towards Second Measure, and was not even responsible for the idea that may have led to the initial collaboration.

### B. The Parties Contemplate Forming a Business

In or around July 2013, while Mr. Kim and Mr. Babineau were both living in the San Francisco Bay Area, Mr. Kim introduced Mr. Babineau to Mr. Jafri. Mr. Jafri, a financial research analyst, had access to large consumer spending datasets, and sought the help of an engineer to help analyze and obtain some actionable intelligence from them. Mr. Jafri, then with hedge fund Tiger Global Management, LLC, sought to trade directly from trends and information gleaned from consumer spending datasets. Mr. Kim, having learned what Mr. Jafri was trying to accomplish, suggested that Mr. Babineau help Mr. Jafri flesh out some of the technical issues and possible solutions with Mr. Jafri's concept. This is confirmed in the parties' communications from the time:

> Steven Kim        7/8/13 5:54 PM        Dude so my buddy zafar asked if I can intro you guys
> Steven Kim        7/8/13 5:54 PM        He's working on some data shit and

|   |   |   |
|---|---|---|
| | | wanted your advice. For mining data for stock research |
| Steven Kim | 7/8/13 5:54 PM | Would you be cool with that? |
| Mike Babineau | 7/8/13 5:55 PM | sure |

Messrs. Jafri and Babineau did engage in such discussions in July 2013. At the time, Mr. Jafri was unwilling to disclose the source of the data. Ultimately, Mr. Kim identified the source of the data, as confirmed in a September 17, 2013 email from Mr. Kim, with subject line: "I FOUND THE DATA!!!."

Mr. Kim apparently thought Mr. Jafri's idea was a good one, and discussed the possibility of forming a business based on the idea with Mr. Babineau. Mr. Babineau thought the concept warranted at least an examination, and began to evaluate the possibility of forming a business on the concept when Messrs. Babineau and Kim gained access to the data later in September 2013. The data provider's agreement made clear that the data was only to be used as part of a research project, with results to be reported back to data provider. The parties were not permitted to commercialize the data in any way, and were not even to receive any compensation from the data provider as part of the evaluation. Mr. Kim and Mr. Babineau each separately, and individually, entered into the data evaluation agreements, and each did so without referencing Project Recon or any purported partnership.

As the parties began to collaborate, Mr. Kim did not ask for Mr. Babineau to sign an NDA. Indeed, it was Mr. Jafri's idea they were moving forward with, and even used the same data he had access to. Further evidencing that Mr. Kim's purported "idea" was neither conceived by him, nor unique, is that there are multiple companies currently offering services and products based on consumer spending data, including, 7Park Data, 1010data, First Data, MasterCard, and Yodlee. The availability and use of consumer spending datasets is widely known and generally available to finance and banking professionals.

Mr. Babineau immediately realized that the evaluation would benefit from a data engineer, and recruited Ms. Chou to assist in October 2013, within days of their gaining access to a consumer spending dataset. From then on, Messrs. Babineau and Kim, and Ms. Chou collaborated together to evaluate the possibility of forming a business built on consumer spending dataset analytics and services. At no point beginning in September 2013, or any time thereafter, did the Messrs. Babineau and Kim, and Ms. Chou come to any agreement to form a business together, come to any agreement



4

Second Measure Parties' Trial Brief                                             Case No. 3:15-CV-03395

as to equity split in any business, or agree to assign any intellectual property they may have created to any business. Indeed, Mr. Kim admitted in a videotaped deposition that there was no explicit agreement multiple times:

> Q. And so at that point when you decided to work together, did you come to kind of any explicit agreement as to your split in the business?
> A. No.
> …
> Q. So did you guys come to an agreement then on the split of the business?
> THE WITNESS: Not an explicit agreement, no.
> …
> Q. Do you recall any conversation in any medium where Mr. Babineau explicitly said he would agree to the 50/50 split?
> A. I do not.[2]

In fact, none of Messrs. Babineau and Kim, or Ms. Chou left their then-respective full-time jobs, and none of them then committed to working together and forming a specific business.

### C. Mr. Kim Discontinues Any Involvement in the Business Evaluation

In March 2014, Mr. Kim terminated his involvement with the business evaluation as a result of two events: 1) Messrs. Babineau and Kim, and Ms. Chou were unable to come to an agreement with the data provider as to continued use of its datasets, and 2) Mr. Kim moved from California to Dallas, Texas to accept a position with Surveyor. In correspondence during that time, Mr. Kim conveyed that he would likely not be able to continue to work with Mr. Babineau and Ms. Chou in evaluating the business concept due to the conflict of interest.

> Steven Kim   2/26/14 11:53 PM   if i do DAL, it will be tough for me to hustle Recon... conflicting interests maybe?
> …
> Steven Kim   6/5/14 2:31 AM   [the data provider] is concerned about conflict of interest…
> Mike Babineau   6/5/14 2:31 AM   understandable
> Steven Kim   6/5/14 2:31 AM   Of me being an employee of their big customer and out there selling it to funds
> Steven Kim   6/5/14 2:31 AM   Yup. I agree.
> …
> Mike Babineau   6/5/14 2:34 AM   isn't there a conflict anyway?
> Mike Babineau   6/5/14 2:34 AM   realistically?
> Mike Babineau   6/5/14 2:35 AM   if you're working for a fund, anything that

---

[2] Mr. Kim later recanted that earlier testimony after the parties took a break and Mr. Kim had an opportunity to discuss the issue with his attorney.



```
                empowers other funds is a conflict
Mike Babineau       6/5/14 2:35 AM       it'd be like me selling a 3d engine while I
                was at rumble
…
Mike Babineau       6/5/14 2:38 AM       what is [the data provider] concerned
                about? alienating citadel [(Surveyor's Parent Company)]? or concerned that
                you'll hold back
Steven Kim    6/5/14 2:40 AM       1) alienating citadel
Steven Kim    6/5/14 2:40 AM       2) funds will look at me like I'm a loose canon
                since I'm trying to sell them something that will help them compete against me
Mike Babineau       6/5/14 2:40 AM       yea, I can see how your credibility would
                be undermined
Mike Babineau       6/5/14 2:40 AM       from a sales perspective
Mike Babineau       6/5/14 2:41 AM       that's true regardless of what you're
                selling
Mike Babineau       6/5/14 2:41 AM       as for alienating citadel, I think that's a
                risk no matter what we're doing
Mike Babineau       6/5/14 2:41 AM       right?
Steven Kim    6/5/14 2:41 AM       As long as I'm at citadel
Mike Babineau       6/5/14 2:41 AM       yea
Mike Babineau       6/5/14 2:41 AM       I mean, I guess the tough question is
Mike Babineau       6/5/14 2:42 AM       how publicly involved should you be with
                recon?
Steven Kim    6/5/14 2:42 AM       I think not very
```

Mr. Kim recognized that working with Mr. Babineau and Ms. Chou on such an investment-related project would present a conflict of interest for Mr. Kim with his employment with Surveyor, and admitted to the same at his videotaped deposition.

Between March and August of 2014, Mr. Kim showed no interest in continuing to evaluate the business concept, or to work with Mr. Babineau and Ms. Chou to form a business built on the concept they were evaluating. Mr. Kim had just started a new, full-time job with Surveyor, and was unwilling to jeopardize that with a conflicted position, or leave Surveyor for the uncertainty of committing full-time with Recon, a project with no ability to earn revenue.

On the other hand, between August and September 2014, Mr. Babineau and Ms. Chou moved closer to committing to form a business built upon consumer spending datasets, and analytics thereof, and working on the endeavor on a full-time basis. Mr. Kim made clear that he was unwilling to match Mr. Babineau and Ms. Chou's commitment to the contemplated enterprise.

In the midst of this strife, Project Recon had a further demo with the data provider, in early-September 2014. By all accounts things went well, but the data provider wanted some follow-up



information, and was not fully sold. This was not unexpected from the data provider. Over the past year, Recon kept showing the data provider what it could do, only to be met with further demands from the data provider, tepid responses, or lack of engagement. Mr. Kim was trusted to respond to the data provider's September 2014 requests. Recon wanted to respond quickly to alleviate the data provider's repeated concerns that this was a part-time effort, and not a serious endeavor by Recon. However, Mr. Kim did not quickly respond, despite Mr. Babineau urging him to do so. Mr. Kim blamed Mr. Babineau for not responding to an earlier request to discuss. Mr. Babineau and Mr. Kim traded accusations, and their relationship fractured.

Things came to a head when Mr. Kim emailed Mr. Babineau and Ms. Chou on September 15, 2014, expressing that he did not want to work or engage in any business with Ms. Chou, and was terminating the business, writing:

> I would like to hear what Lillian thinks is fair, but a clean break is necessary. Lillian will be compensated in a way we can agree on and she will no longer be contributing to the product unless another explicit agreement is outlined beforehand. Otherwise, this creates an inherent conflict of interest that is counterproductive for the business…We should not be moving forward with anything until this is figure out so please shut down our servers for the time being – let's not incur expenses while we figure this out…Please include me in future Recon-related discussions with The Factory or anyone else that is related to the business. Let them know we are in a holding pattern as we try to figure something out.

Mr. Babineau and Ms. Chou took this email to mean exactly what it said, that Mr. Kim wanted to radically alter Recon by forcing out Ms. Chou, and absent acceptance of those terms, would be terminating the project. It is clear that Mr. Kim moved first to end the parties' relationship.

On September 18, 2014, Mr. Babineau responded to Mr. Kim's September 15, 2014 email, stating that the parties had not formed any business, and if they had, that he and Lillian were withdrawing from the same—even though Mr. Kim had already ended the business. Mr. Babineau made clear that there were fundamental disagreements between him and Mr. Kim that made any business arrangement between the two impossible.

At the time of the break, Recon did not have any customers, potential sources of revenue, or any business opportunities. Its sole data provider would not let it use its data for commercial purposes, and that was not going to change while Mr. Kim was still a part of Recon and Surveyor,



given the conflict. In light of the fractured nature of their relationship, it was extremely unlikely that Recon would conduct any further activities whatsoever. There were certainly no Recon business opportunities that Mr. Babineau was trying to seize for himself—he only wanted to stop collaborating with Mr. Kim.

### D. Mr. Babineau and Ms. Chou Form Second Measure

In late-September 2014, having agreed to form a new business together, and a business generally for the first time, Mr. Babineau and Ms. Chou decided to start anew with respect to all computer code and design. They discarded all code, materials, work product, and design developed prior to September 2014, including any code that may have been developed in consultation with Mr. Kim, or on which Mr. Kim may have provided design and guidance feedback. Mr. Babineau and Ms. Chou were diligent in setting aside and not using any contribution Mr. Kim may have provided before starting their new venture, and Mr. Kim cannot prove otherwise.

Nor did Mr. Babineau and Ms. Chou's business / Second Measure take any purported partnership opportunities from Project Recon. The data provider did not offer Recon any agreement, nor was any agreement imminent. The data provider and Recon had been discussing deal options for a year, between September 2013 and September 2014, with no conclusion—or even a term sheet. The data provider only kept wanting to see further progress, and seek further information from Recon—essentially stringing Recon along, as it had with other people seeking to use the data. The data provider also made clear that there would not be any deal so long as Mr. Kim was an employee of Surveyor.

Despite starting afresh, as a bit business puffery, Mr. Babineau and Ms. Chou did represent to third parties that they had been working on the new business prior to its actual start date. Mr. Babineau and Ms. Chou did so to gain free access to services they would have ordinarily had to pay for, and in relation to applying to Y Combinator—just like any job applicant may spruce up his or her resume when applying to a job. Had they not so massaged their background, it would have been much harder to sell themselves as a reputable company, in an already crowded industry.

It was Mr. Babineau and Ms. Chou's newly formed September 2014 business, without any input from Mr. Kim, and wholly unrelated to Mr. Kim, that eventually evolved into Second Measure.

No Project Recon resources were used to incorporate Second Measure.

**E. Mr. Kim Is Invited to Consult**

In or around January 2015, Second Measure invited Mr. Kim to join their company as a consultant, on the same or similar terms as discussed in mid-November 2014 through an email exchange between Mr. Babineau and Mr. Kim. Mr. Kim had already been providing some consulting services around this time. Ultimately, Mr. Babineau, on behalf of Second Measure, came to an oral consulting agreement (the "Consulting Agreement") with Mr. Kim in January 2015. In doing so, Mr. Kim implicitly acknowledged that he was not due any other equity in Second Measure. The Consulting Agreement provided that Mr. Kim would advise the Company as to strategy, deals, customers, competitors, and data sources, stemming from his expertise in the financial space. Mr. Kim was also to provide Second Measure with introductions to potential customers, partners, investors, and other interested persons. In exchange for the significant services agreed upon, the Company agreed to provide Mr. Kim with a total of 10% of the stock of Second Measure, with 2% fully vested, and the remaining 8% to vest over the next four years, with the understanding that the equity interest provided by the Consulting Agreement was the only source of Mr. Kim's equity interest in Second Measure.

Despite the oral Consulting Agreement, Mr. Kim failed to provide the significant consulting services required of him. As such, Mr. Kim never earned the initial 2% interest in Second Measure, or the subsequent 8% that was to vest over the four years from the date of the Consulting Agreement. However, because of the oral agreement, the Company assumed that Mr. Kim would be joining as a shareholder, and drafted corporate documents reflecting that (which were never ultimately executed on account of Mr. Kim's breach).

**III.   LEGAL ANALYSIS**

Second Measure claims breach of the oral Consulting Agreement, and Second Measure, Mr. Babineau, and Ms. Chou seek declaratory relief regarding Mr. Kim's partnership status with respect to the Company. Mr. Kim claims various partnership based theories.

**A. The Parties Did Not Form A Partnership**

Mr. Kim's theory is based on the premise that a partnership or joint venture was formed

between Mr. Kim and Mr. Babineau, but not Ms. Chou despite her involvement since the onset of the collaboration. The rights and liabilities of joint venturers, *inter se*, are governed by the same principles applicable to partnerships. *Stodd v. Goldberger*, 73 Cal. App. 3d 827, 836 (1977) (citing *Zeibak v. Nasser*, 12 Cal.2d 1, 12 (1938); and *Watterson v. Knapp*, 35 Cal.App.2d 283, 287 (1939)). The Uniform Partnership Act of 1994, adopted by California, sets forth some of the usual indicia of the existence of a partnership or joint venture:

1. Co-ownership of property;
2. Sharing gross returns; and
3. Sharing business profits.

9 Witkin Summary of California Law 10th (2005) Partnerships, § 24, p. 599; Cal. Corp. Code § 16202(c)(3). However, the presence of the above items does not, in itself, indicate the existence of a partnership or joint venture. Cal. Corp. Code § 16202(c); *see Brockman v. Lane*, 103 Cal. App. 2nd 802 (1951) (no partnership was created where defendants furnished capital to acquire farmland, and plaintiff managed it and received equal share of the profit); *Fischer v. Carey*, 173 Cal. 185 (1916) (partnership did not arise between part owners of ships merely because of their ownership; parties were tenants in common in ships, not partners); *Wheeler v. Farmer*, 38 Cal. 203, 213 (1869) (contract for promotion by defendant of vending machines invented by plaintiff and division of proceeds was not partnership).

Only the sharing of business profits leads to rebuttable presumption that a partnership or joint venture was formed. Cal. Corp. Code § 16202(c)(3); *Holmes v. Lerner*, 74 Cal. App. 4th 442, 453-54 (1999).

Here, there were no profits, let alone sharing of profits, nor any gross returns. In fact, the parties, per their agreement with the data provider, could not commercialize the data in any respect, nor were they due any compensation from the data provider. Even if they wanted to start a partnership for profit, they could not. In fact, the purported partnership did not enter into any agreement with the data provided. It was the individual parties that entered into separate agreements with the data provider, without reference to any partnership. This meant that the right to access the data did not belong to the purported partnership, but only to the individuals. Cal. Corp. Code § 16202(d). As such,

Mr. Kim cannot credibly argue that there was a business partnership pursuing a business opportunity with the data provider.

Instead, Recon was working on developing a proof of concept. It was friends hacking for fun, in their spare time. If they could get a proof of concept going, and if they could convince the data provider to let them use the data for commercial purposes, Recon could have matured into an actual business. However, Recon never overcame those hurdles.

### B. Partners to an At-Will Partnership May Terminate the Partnership and Compete

As Mr. Kim does not allege that the partnership or joint venture was to continue for a definite term, or a particular undertaking, it was a partnership or joint venture-at-will, which either of Mr. Kim or Mr. Babineau could withdraw from at any time. Cal. Corp. Code § 16801(1). As a partnership or joint venture must consist of at least two persons or entities, Mr. Kim or Mr. Babineau withdrawing from the alleged partnership or joint venture would serve to dissolve that partnership or joint venture. *Corrales*, *supra*, 198 Cal. App. 4th at 224. The evidence will show that if there was any partnership, it was Mr. Kim who dissolved the partnership in September 2014, by kicking out Ms. Chou, and demanding that all work cease. If it was not Mr. Kim who dissolved the partnership, Mr. Babineau thereafter made clear that he was dissolving and terminating the alleged partnership. In any event, the purported partnership effectively dissolved and terminated in September 2014.

When the partnership or joint venture dissolved in September 2014, Mr. Babineau was free to pursue the same line of business as the partnership or joint venture, and directly compete with Mr. Kim, without accounting to Mr. Kim for any profits, so long as he did not do so with partnership assets and opportunities. *Miller v. Hall*, 65 Cal. App. 2d 200, 204 (1944); California Jurisprudence 3rd, Partnership, 48 Cal.Jur.3d Partnership § 135 ("In case of dissolution, each partner has a right to reengage in the same line of business, in the absence of an agreement to the contrary."). Indeed, California maintains a strong public policy in favor of free competition, and renders void any contract that serves to restrain trade, absent a statutory exception. Cal. Bus. & Prof. Code § 16600. While Cal. Bus. & Prof. Code § 16602 provides a carve-out that allows partners to agree to non-competition agreements when such agreements are limited in geographic scope, and the partner enforcing the non-compete carries on a like business within the geographic area, it is not applicable here, as no such

non-competition agreement is alleged, and Mr. Kim has not pled that he is carrying on a like business.

Accordingly, Mr. Babineau was within his rights to withdraw from the purported partnership or joint venture, and thereafter directly compete with Mr. Kim in the same line of business, including forming Second Measure, because he did so without using any partnership assets or opportunities. To the extent Mr. Kim's counterclaims are premised on Mr. Babineau terminating the partnership or joint venture, and thereafter conducting the same line of business, they must fail. To the extent Mr. Kim's counterclaims are premised on Mr. Babineau owing a fiduciary duty to Mr. Kim after September 2014, and breaching that duty, they must fail. California law makes clear that any duties a partner owes to another partner survive only as to unfinished business at dissolution, and end completely at termination. Cal. Corp. Code § 16404(b).

To be clear, Mr. Babineau did not back out of any partnership with Mr. Kim to misappropriate a partnership opportunity for himself, and no such opportunity existed. Mr. Babineau left Recon because Mr. Kim attempted to force Ms. Chou out, Mr. Kim was conflicted from pursuing any opportunity, and had been dragging his feet on working towards Recon as a result. The evidence at trial will make clear that there was no deal with the data provider on the table, or term sheet, or concrete discussion of terms.

Nor was any deal immediately available to Second Measure in September 2014, after its January 2015 incorporation, or any time immediately thereafter. Second Measure started over, built its product from scratch without use of any Recon assets, and ultimately reached a commercial deal with a data provider much later. Mr. Kim cannot prove otherwise.

**C. Mr. Kim Does Not Have Any Damages Or A Right To Equitable Relief**

Assuming that Mr. Kim prevails on all of his claims, Mr. Kim will not be awarded any significant damages. Additionally, Mr. Kim's claims do not request or warrant any type of specific performance, injunctive relief, or other equitable remedy.

Mr. Kim's damages theory is ostensibly based on his receiving value for his interest in any Recon assets or business opportunities Mr. Babineau took from the purported partnership. As set forth above, and as Second Measure's expert will testify, the purported partnership did not have any



assets or opportunities of any significant value, and any resulting value as a whole. This was because Mr. Babineau and Ms. Chou refused to work with Mr. Kim at the end of the alleged partnership, and did not have a shared vision of what should be done next; that the alleged partnership did not have the right to use any consumer spending data for commercial purposes, and therefore had no source or potential source of revenue, sales, or customer relationships; that the alleged partnership had no working product, and did not have the funds to develop a working product; and that the alleged partnership could not sustain itself financially, or raise external funding.

Mr. Kim may argue that his general idea, which he stole from Mr. Jafri, was protectable and had value, but courts have disagreed. In the context of partnerships, and business enterprises generally, it is not the generic idea that is protectable or subject to ownership, but the results of that idea reduced to practice:

> Many businesses and great industrial organizations have sprouted from the germ of an idea in the mind of some man. When the idea is reduced to concrete form and put into action in the form of a business enterprise, an invention, a book, an opera or a theatrical production, the results of the idea are subject to private ownership. This is just the situation we have here. The original idea for the production sprouted in MacQuarrie's brain. The idea was reduced to concrete form and put into action as a theatrical production transmitted to the public over the radio. The production, if not the idea, was the subject of private ownership and under the findings of the trial court became the property of the partnership, which was a partnership at will as no time was fixed by the partners for its duration.

*Lyon v. MacQuarrie*, 46 Cal. App. 2d 119, 125-26 (1941) (disapproved on other grounds in *Weiner v. Fleischman*, 54 Cal. 3d 476 (1991)) (emphasis added); *see Holmes v. Lerner*, 74 Cal. App. 4th 442, 458 (1999).

Mr. Kim may also claim that his damages are equal to a portion of the value of Second Measure, but that claim must also fail. As set forth above, Second Measure's value is derived from the efforts of Mr. Babineau, Ms. Chou, and Second Measure's other employees—not Mr. Kim. Mr. Kim will be unable to prove that *any* Recon materials or work product went into Second Measure.

Mr. Kim will not be awarded any type of quantum meruit type of award for services rendered as that was not requested in Mr. Kim's claims, and partners to a partnership are not automatically entitled to fees for services rendered to the partnership absent an explicit agreement. Cal. Corp. Code § 16401(h)("A partner is not entitled to remuneration for services performed for the partnership,



except for reasonable compensation for services rendered in winding up the business of the partnership.").

Mr. Kim's belated request, asked for the first time on the eve of the initial trial, for a constructive trust must also fail. A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner. *Communist Party v. 522 Valencia, Inc.*, 35 Cal.App.4th 980, 990 (1995). The principal circumstances where constructive trusts are imposed are set forth in California Civil Code sections 2223 and 2224. Section 2223 provides that "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Cal. Civ. Code § 2223; Cal. Civ. Code § 2224. Section 2224 states that "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Under these statutes and the case law applying them, a constructive trust may only be imposed where the following three conditions are satisfied: (1) the existence of a res (property or some interest in property); (2) the right of a complaining party to that res; and (3) some wrongful acquisition or detention of the res by another party who is not entitled to it. *Communist Party,* 35 Cal.App.4th at 990. The remedy of constructive trust is defeated if plaintiffs are unable to trace the trust property into its succeeding transfigurations. *Heckmann v. Ahmanson*, 168 Cal.App.3d 119, 136 (1985).

Mr. Kim claims he is entitled to a constructive trust of the equity of Second Measure, but this claim must fail. Mr. Kim would have to show that there was some partnership res, that he had a right to that res, and that Mr. Babineau wrongfully acquired that res. By claiming the purported partnership business generally was that res, Mr. Kim's arguments fail because he does not identify a specific property of interest in that property. Mr. Kim's arguments also fail the strict tracing requirements needed before the imposition of a constructive trust. Second Measure did not exist at the time of the purported partnership, and no assets from the purported partnership were used to incorporate Second Measure. Mr. Kim cannot demonstrate otherwise.

Mr. Kim has no right to any equity in Second Measure simply because he contends it is the

1 same business as the partnership. Mr. Babineau and Ms. Chou were free to use their own assets to
2 incorporate Second Measure, and thereafter take stock in the Company. This all could be and was
3 accomplished without use of any purported partnership assets.

**D. Mr. Kim Did Breach His Consulting Agreement With Second Measure**

Mr. Kim did breach his oral Consulting Agreement with Second Measure, and Second Measure has suffered damages. Under California law, a claim for breach of contract includes four elements: that a contract exists between the parties, that the plaintiff performed his contractual duties or was excused from nonperformance, that the defendant breached those contractual duties, and that plaintiff's damages were a result of the breach. *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1101 (E.D. Cal. 2010).

The evidence will make clear that Mr. Kim so entered into a contract with Second Measure, but failed to perform. Second Measure will prove its damages at trial.

**IV.   CONCLUSION**

For the foregoing reasons, the Second Measure Parties are entitled to judgment against Mr. Kim on all claims.

Respectfully submitted,

Date: May 8, 2015                    DHILLON LAW GROUP INC.

By:  */s/ Nitoj P. Singh*
     Nitoj P. Singh

     Attorneys for Second Measure Inc., Michael Babineau, and Lillian Chou



15

Second Measure Parties' Trial Brief                                    Case No.  3:15-CV-03395