1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
NITOJ P. SINGH (SBN: 265005)
nsingh@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Second Measure, Inc., Michael Babineau,
and Lillian Chou

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SECOND MEASURE, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>STEVEN KIM, an individual,<br><br>    Defendant,<br><br>AND RELATED COUNTERCLAIMS. | Case Number: 3:15-CV-03395-JCS<br><br>**DECLARATION OF NITOJ P. SINGH IN SUPPORT OF PLAINTIFF SECOND MEASURE INC.'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE CERTAIN EVIDENCE FROM DEFENDANT STEVEN KIM'S EXPERT MARK NEWTON**<br><br>Pretrial Conference: May 19, 2017<br>Trial Date:    June 1, 2017<br><br>Judge:     Hon. Joseph C. Spero<br>Courtroom:   G, 15th Floor |



1

Singh Decl. ISO Second Measure's Motion *in Limine* 1    Case No.  3:15-CV-03395-JCS

I, Nitoj P. Singh, declare as follows:

1.      I am a Senior Associate Attorney with the Dhillon Law Group Inc., counsel of record for Second Measure, Inc., Michael Babineau, and Lillian Chou. I am licensed to practice before all courts of the State of California, and the United States District Court, Northern District of California. Except as otherwise stated, I have personal knowledge of the facts set forth herein, and if called as a witness, would competently testify thereto.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Report of Jim Timmins I served on counsel for Defendant Steven Kim ("Mr. Kim") on July 1, 2016. This Report has been redacted to limit the unnecessary disclosure of confidential and trade secret information.

3.      I did not receive any expert reports from counsel for Mr. Kim on or around July 1, 2016.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of the Expert Witness Rebuttal Report of Mark Newton served on my office on July 28, 2016. This Report has been redacted to limit the unnecessary disclosure of confidential and trade secret information.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of a March 2, 2016 meet and confer letter I received from counsel for Mr. Kim.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: April 19, 2017          By:      */s/ Nitoj P. Singh*_____
                                                              Nitoj P. Singh



2

Singh Decl. ISO Second Measure's Motion *in Limine* 1          Case No.  3:15-CV-03395-JCS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| _____ ) <br><br> ) <br> SECOND MEASURE, INC., a Delaware ) <br> corporation, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> STEVEN KIM, an individual, ) <br> ) <br> Defendant. ) <br> ) <br> _____ ) <br> ) <br> STEVEN KIM, an individual, ) <br> ) <br> Counterclaim Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL BABINEAU, an individual, ) <br> LILLIAN CHOU, an individual, and ) <br> SECOND MEASURE, INC., a Delaware ) <br> corporation, ) <br> ) <br> ) <br> Counterclaim Defendants. ) <br> _____ ) | Case No. 3-15-CV-03395 |

EXPERT REPORT OF JIM TIMMINS
TEKNOS ASSOCIATES

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

July 1, 2016

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

# TABLE OF CONTENTS

                                                                                    PAGE

I.     INTRODUCTION                                                                    2

II.    BACKGROUND, EXPERTISE, COMPENSATION, AND QUALIFICATION                          2


III    SUMMARY OF CONCLUSIONS                                                          6

IV.    BACKGROUND ABOUT SECOND MEASURE                                                 6
       A.  BUSINESS DESCRIPTION                                                        6
       B.  FINANCIAL HISTORY AND STATUS                                               7

V.     INDUSTRY OVERVIEW AS OF MARCH 31, 2016                                          8

VI.    ECONOMIC OVERVIEW AS OF MARCH 31, 2016                                         10
       A. GENERAL ECONOMIC CONDITIONS                                                11
       B. CONSUMER PRICES AND INFLATION RATES                                        11
       C. INTEREST RATES                                                             11
       D. STOCK MARKET                                                               12
       E. ECONOMIC OUTLOOK                                                           13

VII.   VALUATION OF EQUITY OF SECOND MEASURE AS OF MARCH 31, 2016                     13
       A. STANDARD OF VALUE, PREMISE OF VALUE, AND LEVEL OF VALUE                     13
       B. VALUATION PROCEDURE                                                        14
       C. VALUATION APPROACHES CONSIDERED AND SELECTED                               14
       D. APPLYING THE MARKET APPROACH: GUIDELINE PUBLIC COMPANY METHOD               16
       E. APPLYING THE GUIDELINE M&A TRANSACTION METHOD                               19
       F. WEIGHTING OF APPROACHES AND SINGLE POINT DETERMINATION OF VALUE             21
       G. APPLICATION OF DISCOUNTS FOR LACK OF CONTROL AND LACK OF MARKETABILITY      21

VIII   VALUATION OF EQUITY OF PROJECT RECON AS OF SEPTEMBER 15, 2014                  23
       A. STATUS OF PREDECESSOR ENTITY                                               23
       B. FACTORS CONSIDERED BY VENTURE CAPITALISTS IN MAKING AN INVESTMENT           24
       C. SUITABILITY OF PROJECT RECON FOR VENTURE CAPITAL INVESTMENT                 26


       APPENDIX A
       APPENDIX B
       EXHIBITS

CONFIDENTIAL                                                  TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

## I.  INTRODUCTION

1.     Teknos Associates LLC ("Teknos") has been retained by Dhillon Law Group Inc. ("Dhillon Law"), counsel to Second Measure, Inc. ("Second Measure" or the "Company"), Michael Babineau ("Babineau") and Lillian Chou ("Chou"), to provide expert services and testimony in connection with Second Measure's claims against Steven Kim ("Kim") and Kim's counterclaims against Babineau, Chou, and Second Measure, before United States District Court, Northern District of California – San Francisco Division (the "Action").

2.     I am a Managing Director of Teknos, a financial services advisory firm based in Palo Alto, CA.  Teknos provides valuation and financial advisory services for tax compliance, financial reporting, transaction support, and litigation.  I am an expert in business valuation, and damages.

3.     In particular, I have been retained to:

a.     Calculate the value of a 1% interest[1] in Second Measure as of March 31, 2016.

b.     Calculate the value of a 1% interest[2] in a predecessor entity (known as "Project Recon") to Second Measure as of September 15, 2014 (if any such predecessor entity is deemed to exist).

c.     Respond to the opinions of an opposing expert (if any).

d.     Provide such other opinions as may be relevant to this Action.

## II.  BACKGROUND, EXPERTISE, COMPENSATION, AND QUALIFICATION

4.     Before forming Teknos, I was a Managing Director of Pagemill Partners, a Managing Director of The Daiwa Securities Group, NIF Ventures (now NIF Sumitomo Mitsui

---

[1] I used 1% because it can be multiplied or divided readily to calculate the value of any minority, non-marketable interest.  It do not meant to imply that Kim had a 1% interest – or any economic interest – by using this number.
[2] See footnote 1, above.

CONFIDENTIAL                                                        TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Banking Corporation Ventures), and a General Partner of Glenwood Ventures and Glenwood Capital.  Earlier in my career I worked at Hambrecht & Quist and Salomon Brothers.

5.     I received a BA from Trinity College, University of Toronto, and an MBA from the Graduate School of Business, Stanford University.

6.     I have been designated as an "Accredited Senior Appraiser" ("ASA") in both "Business Valuation" and "Intangible Assets" by the American Society of Appraisers, as a "Master Analyst in Financial Forensics" ("MAFF") in "Business and Intellectual Property Damages" by the National Association of Certified Valuators and Analysts, and as a "Certified Equity Professional" ("CEP") by the Certified Equity Professional Institute, Leavey School of Business, Santa Clara University.  I am current in my continuing education requirements to maintain all four of these designations.

7.     During my nearly 35 year career in Silicon Valley, I have provided investment banking, venture capital investing, and valuation services to a variety of companies and government agencies.  I have considerable experience in investing and financing, mergers and acquisitions, and valuations and fairness opinions.

8.     I have been a member of the board of directors and, in many cases, the compensation committee and/or audit committee, of 15 private and public companies.

9.     I have invested in and worked with companies in a range of industries, including bio-technology and pharmaceuticals, communications and networking, education, energy, entertainment, financial services, food and nutraceuticals, information technology and business services, medical devices, semiconductors, software, specialty retailing, storage, and others.

10.     In particular, I have invested in and worked with a number of companies in data analytics and financial services, including Advisor Software, Arcesium (spun-out from DE Shaw Group), BitYota (acquired by LifeLock), Databricks, Enso Financial, ESQ Business Services, InQuira (acquired by Oracle), Insights One (acquired by Apigee), Merchant e-Solutions (acquired by Cielo), Paradata, Plum Lending, Qualpay, Silicon Valley Data Science, Silk, Size Technologies (acquired by First Data), Standard Treasury, Telepin Software,

CONFIDENTIAL                                                              TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Treasure Data, Xignite, and Xulu Financial (acquired by BlackRock).  In addition, I have provided valuation services to a number hedge funds, private equity funds, and venture capital funds, as well as to more traditional asset management firms.

11.   I have been involved in all stages of company life, from start-up through merger and acquisition ("M&A") or initial public offering ("IPO"), and in most aspects of emerging growth company development, including strategic planning, management recruiting, market, technology, intellectual property protection and licensing, corporate partnering, and fund raising.  I have been involved extensively in analysis, structuring, valuation, and due diligence review of all aspects of transactions.

12.   I have been a guest lecturer about private company investing, M&A, public offerings, and valuation at:  the Boalt Hall School of Law and the Haas School of Business, University of California Berkeley; the School of Law, Santa Clara University; the Graduate School of Business, Stanford University; and the Wharton School, University of Pennsylvania. I have been an instructor for education sessions with the American Society of Appraisers, teaching continuing education programs for appraisers about valuation in litigation, and I have been an instructor for the Practicing Law Institute ("PLI"), teaching continuing education programs for lawyers about term sheet negotiation.  I also have been a speaker about a range of emerging growth company and venture capital issues at numerous conferences and industry associations, in the US and abroad.

13.   I have provided expert services in connection with litigation on behalf of a range of companies, including AmerisourceBergen, FLIR Systems, Intel, National Semiconductor, Palo Alto Networks, Tesla Motors, Wells Fargo, and others, plus the Internal Revenue Service.

14.   Attached as Appendix A is a true and correct copy of my current curriculum vitae.

15.   I prepared this Expert Report with the assistance of others at Teknos, working under my supervision.  Compensation for the work performed by Teknos is billed on an hourly basis at the following rates:  Managing Director, $700; Vice President, $350; Associate or Analyst, $200; and Clerical, $100.  Teknos also is reimbursed for out of pocket travel and related expenses.

CONFIDENTIAL                                                    TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

16.     Neither Teknos nor any of its members or employees has any interest in or relationship with Second Measure or its managers or shareholders, any other party to the Action, or any of the lawyers or law firms involved in the Action.  The compensation to Teknos is not contingent on the outcome of the Action.

17.     In preparing this Expert Report (and in later giving testimony), I have considered and utilized processes, methodologies, analyses, standards, and principles which are the same as those I have used in my nearly 35 year advisory and transactional career.  My analysis, opinions, and conclusions are based on my experience and on information obtained through research, information in case documents, and information provided by Dhillon Law and are based on the documents which I have reviewed as of the date of this Expert Report.  I have spoken with counsel at Dhillon Law and managers at Second Measure.  I also have relied upon or considered the other materials identified in the text and footnotes of this Expert Report.  The case documents and information provided by Dhillon Law are listed on Appendix B.  It is considered usual and customary in my field to rely upon these sorts of documents in performing analysis and reaching opinions and conclusions.  Some of these materials are confidential and subject to a protective order; I have treated them as such. My opinions are expressed to the best of my professional knowledge.

18.   This Expert Report was prepared for the Action and is to be used only in connection with it.

CONFIDENTIAL                                                  TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

## III.   SUMMARY OF CONCLUSIONS

19.   The value of a 1% minority, non-marketable interest in Second Measure as of March 31, 2016, was ███ .

20.   The value of a 1% minority, non-marketable interest in Project Recon as of September 15, 2014, was $0.

## IV.   BACKGROUND ABOUT SECOND MEASURE

### A.   Business Description

1.   Second Measure is a privately held software and services company which provides a platform and data about consumer credit card transactions that can be used to make investment decisions in connection with public and private companies.[3] As of March 31, 2016, the Company was based in San Mateo, CA, and had ██ employees.[4]



3.   Second Measure was formed in late 2014 and incorporated in Delaware on January 14, 2015.  Its founders were Babineau and Chou and they hold the positions of CEO and Co-Founder, respectively.[6]  The founders enrolled in the incubation program of Y Combinator and completed that in the summer of 2015.[7]  In November 2015, the Company raised approximately $2 million from a group of venture capital firms and angel investors.[8]

---

[3] Second Measure website:  www.secondmeasure.com
[4] Interview with Mike Babineau, June 28, 2016.
[5] Interview with Mike Babineau, June 28, 2016.
[6] Certificate of Incorporation filed with the Secretary of State of Delaware on January 15, 2015 and interview with Mike Babineau, June 28, 2016.
[7] Interview with Mike Babineau, June 28, 2016.
[8] Interview with Mike Babineau, June 28, 2016.

6

4.     The Company had deployed a production version of its software and had ███ ██████████████████████████████████████████████████████ as revenue generating customers as of March 31, 2016.  Most sales have required a pilot or evaluation period, ranging in length from several weeks to several months.  The Company's CEO was the only individual who performed sales functions and, even so, he did that only part of the time. ████████████████████████████████████████████ ████████████████████████████████████████

5.     The most direct competitors of Second Measure were Earnest Research and 7Park Data; 1010data provides a BI platform and began offering transaction data.   Indirect competitors include Yodlee, First Data, MasterCard, and JP Morgan.  Potential competitors include Intuit, Plaid, Bloomberg, Thomson Reuters, Standard & Poor's Capital IQ.

B.     Financial History and Status

26.     Second Measure generated cumulative revenue of approximately $██████ from inception to March 31, 2016.  The Company first produced revenue of approximately $█████ in the quarter ended September 30, 2015 and revenue was approximately $██████ and $█████ in the quarters ended December 31, 2015 and March 31, 2016, respectively.[10]

27.     Second Measure has incurred cumulative expenses of approximately $██████ from inception to March 31, 2016.  The Company began incurring expenses of approximately $█████ in the quarter ended March 31, 2015 and has incurred expenses of approximately $█████, $██████, $██████, and $█████ for the quarters ended June 30, 2015, September 30, 2015, December 31, 2015, and March 31, 2016, respectively.[11]

28.     Second Measure has incurred cumulative net losses of approximately $██████ from inception to March 31, 2016.[12]  The monthly losses, often referred to as the "burn rate,"

---

[9] Interview with Mike Babineau, June 28, 2016.
[10] Second Measure, Profit and Loss, Jan 2015 to Mar 2016.
[11] Second Measure, Profit and Loss, Jan 2015 to Mar 2016.
[12] Second Measure, Profit and Loss, Jan 2015 to Mar 2016.

CONFIDENTIAL                                    TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

are expected to continue into the foreseeable future as the Company is spending heavily on research and development and as it begins to spend on sales and marketing.[13]

29.    As of March 31, 2016, Second Measure had approximately $⬛⬛⬛ of assets, which included $⬛⬛⬛ in cash and $⬛⬛⬛ in other assets.  As of the same date, the Company had issued approximately $⬛⬛⬛ of so-called "SAFE" (Simple Agreement for Future Equity) securities and approximately $⬛⬛⬛ of different types of debt.[14]

## V. INDUSTRY OVERVIEW AS OF MARCH 31, 2016

30.    The extremely high volume of digital information that has become available in the first part of the 21st century is creating many new challenges for financial institutions – including customer data, capacity, risk measures, market expectations, and operational efficiency.  International Data Corporation (IDC) forecasts that the big data technology and services market will grow from $ 17.2 billion in 2014 to $48.6 billion in 2019, a compound annual growth rate of 23.1%.  The ability to leverage big data and analytics to develop an integrated view of customer activities and business operations will provide competitive differentiation to companies.  From a vertical industry perspective, the largest industries for big data spending include discrete manufacturing ($2.1 billion in 2014), banking ($1.8 billion in 2014), and process manufacturing ($1.5 billion in 2014), followed by securities and investment services[15].

31.    The global financial analytics market has been driven by enhanced technologies in business intelligence ("BI") and business analytics, by high volumes of data, competitive differentiation, and an increased focus on data transparency.  Financial analytics is a part of the BI and business analytics market that focuses.  Increased complexity in financial analysis, growing demand for cloud analytics, increased financial risks frauds created huge opportunities for financial analytics.  The financial analytics market is estimated to grow from $3.65 billion in 2013 to $6.65 billion in 2018, at a compound annual growth rate of 12.9%.  North America

---

[13] Interview with Mike Babineau, June 28, 2016.
[14] Second Measure, Balance Sheet, March 31, 2016.
[15] International Data Corporation, *New IDC Forecast Sees Worldwide Big Data Technology and Services Market Growing to $48.6 Billion in 2019, Driven by Wide Adoption Across Industries.* http://www.idc.com/getdoc.jsp?containerId=prUS40560115

CONFIDENTIAL                                                        TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

is expected to be the biggest market, while emerging economies in the Middle East and Africa (MEA), Latin America (LA), and Asia-Pacific (APAC) are expected to experience increased market traction with high growth rates, in the due course.[16]

32.    Financial institutions have been investing in big data technologies for some time with technology leaders banking on the fact that analytics can prove helpful for varying needs in the future, such as improving trading strategies, portfolio management, regulatory reporting, and client targeting.  Until recently, financial institutions that wanted to examine large pools of data needed to devote significant time and resources into organizing the information as "structured" data, moving it from where it was scattered across several departments and data warehouses, into one location to be indexed, searched, and analyzed.  Fortunately, advances in technology – including processing power, data warehouse storage, and software – are now enabling speedy organization of structured data and starting to allow large pools of unstructured data to be indexed and made searchable in a shorter period of time.  In addition, the emergence of sophisticated analytics software tools is enabling organizations to analyze large sets of data more easily and quickly, using fever resources in the future.

33.    In the face of fierce competition, growing regulatory constraints, and evolving customer needs, institutions are seeking new ways of leveraging technology to differentiate themselves and gain efficiencies, especially with:

a.    Velocity: The speed at which data must be stored or analyzed – in some cases, up to tens of thousands of transactions per second;

b.    Variety: The huge variation in types and sources of big data – from highly structured to unstructured files; and

c.    Volume: The vast quality of big data available – often hundreds of terabytes, or even petabytes of data.[17]

---

[16] MarketsandMarkets, *Financial Analytics Market worth $6.65 Billion by 2018.*
http://www.marketsandmarkets.com/PressReleases/financial-analytics.asp
[17] PricewaterhouseCoopers, *FS Viewpoint.*
https://www.pwc.com/us/en/financial-services/publications/viewpoints/assets/pwc-unlocking-big-data-value.pdf

9

CONFIDENTIAL                                        TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

34.     Most of the large US based financial institutions are using data science algorithms to understand customers in a better way by analyzing different channels customers use – such as ATMs, offline bank branches, mobile applications, call centers, online banking, etc. Data science helps bank in several ways:

a.      With several new channels, banks can serve their customers with their preferred channel by leveraging transactional behavior analytics through various data science algorithms. This also helps financial institutions identify usage for particular products and transaction patterns across various customer segments;

b.      Data science can add great value to financial institutions by helping them find attributes and patterns which have increased probability for fraud;

c.      Data science helps banks optimize the check float criterion by considerably reducing the bottom line costs. All the transaction records go through a decision management process where various Behavioral Scoring Techniques are applied to find out whether to float a check and for how long;

d.      Data science helps financial firms ensure customer satisfaction on quality of service through data-rich insights on changing customer requirements and satisfaction levels. Data science helps banks build a 360 degree view of customer by aggregating cross-lob and external third party data that helps financial institutions serve each customer in his or her own preferred way; and

e.      Data science helps financial institutions forecast various profitability components such as charge-off accounts, delinquency, and closure to help them make effective product and pricing decisions.[18]

## VI.  ECONOMIC OVERVIEW AS OF MARCH 31, 2016

35.     In valuing a business or its assets, it is important to consider the condition of and outlook for the economy in which the business operates.  Conditions affecting an economy

---

[18] Dezyre, *Data Science in Banking and Finance.*
https://www.dezyre.com/article/how-data-science-in-finance-has-increased-the-industrys-profitability/169

CONFIDENTIAL                                                                                    TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

can significantly affect financial performance and, consequently, value.  This section provides an overview of the economy as of the end of the first quarter of 2016.[19]

### A.   General Economic Conditions

36.   The U.S. economy—as indicated by GDP—grew at an annual rate of 0.5% in the first quarter of 2016.  This was the third consecutive quarter of slowed growth, as well as the slowest pace in two years.  Consumer spending continued to slow as Americans spent less on durable goods, most notably motor vehicles and parts.  Government spending rose in the quarter with increased expenditures at the state and local government level offsetting declines in federal government spending.  Business investment fell sharply in the first quarter, dragged down by a large decline in spending on equipment and structures.  An increase in imports also weighed on GDP, as did large decreases in private inventory investment and in exports.

### B.   Consumer Prices and Inflation Rates

37.   According to the Bureau of Economic Analysis, the price index for gross domestic purchases rose 0.3% in the first quarter of 2016, slightly less than the 0.4% increase in the previous quarter.  The price index for gross domestic purchases measures prices paid by U.S. residents.  Excluding food and energy prices, the price index for gross domestic purchases rose 1.4% in the first quarter, compared with an increase of 1.0% in the previous quarter.

### C.   Interest Rates

38.   The Federal Open Market Committee (FOMC) met twice during the first quarter of 2016, issuing a statement from each meeting.  In both meetings this quarter, the FOMC made the decision to maintain the target range for the federal funds rate at 0.25% to 0.5%.  The federal funds rate is the interest rate at which a commercial bank lends immediately available funds in balances at the Federal Reserve to another commercial bank.  The FOMC

---

[19] Excerpt drawn from *Outlook Update 1Q 2016*, published by Business Valuation Resources, LLC 2014

CONFIDENTIAL                                                    TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

establishes a target rate and expands or contracts the money supply with the aim that the federal funds rate, a market rate, will approximate the target rate.

39.   The FOMC stated that it would continue to assess a wide range of information in determining the timing and size of future adjustments to the federal funds rate, including measures of labor market conditions, indicators of inflation pressures and inflation expectations, and readings on financial and international developments.   The statement also noted that, based on the Committee's expectations of economic conditions, the federal funds rate will only rise in gradual increases and will likely remain low for some time.   The statements from the FOMC found that household spending has increased at a moderate rate and that the housing sector has continued to improve.   However, the statement noted that business fixed investment and net exports have been soft.   A range of recent indicators, including strong job gains, indicated that the labor market continues to strengthen.   During the first quarter of 2016, the Board of Governors of the Federal Reserve left the discount rate unchanged, at 1.00%.

   D.   Stock Market

40.   Stocks declined through the middle of February before rising during the remainder of the quarter.   The gains that occurred during the second half of the quarter were great enough to offset the earlier losses for the large- and mid-cap benchmarks.   However, the technology-heavy Nasdaq Composite and the small-cap benchmarks indexes ended the quarter with modest losses.     Among the various sectors, the small utilities and telecommunication services segments within the S&P 500 saw the best gains in the first quarter, rising over 15.0%.   Consumer staples, industrials and business services, energy, and materials shares also performed well.   The healthcare sector and financial sector performed poorly, falling more than 5.0%.

41.   The Dow Jones Industrial Average (Dow) rose 1.5% in the first quarter. Including dividends, the Dow's total return was 2.2% in the first quarter.   The Dow is an index of 30 of the largest and most widely held public companies in the U.S. and is considered the most-watched index in the world.

CONFIDENTIAL                                          TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

    E.   Economic Outlook

43.   Consensus Economics Inc., publisher of Consensus Forecasts—USA, reports that the consensus of U.S. forecasters is that real GDP will increase at a seasonally adjusted annual rate of 2.4% in the second quarter of 2016 and 2.5% in the third quarter.  Every month, Consensus Economics surveys a panel of 30 prominent U.S. economic and financial forecasters for their predictions on a range of variables, including future growth, inflation, current account and budget balances, and interest rates.  The forecasters expect GDP to grow 2.1% in 2016, 2.4% in 2017, and 2.5% in 2018.

## VII.  VALUATION OF EQUITY OF SECOND MEASURE AS OF MARCH 31, 2016

    A.   Standard of Value, Premise of Value, and Level of Value

44.   For the purpose of this assignment, I have calculated the "equity value" of Second Measure as of March 31, 2016.  I have assumed that the standard of value is "fair market value," that the premise of value is "going concern," and that the level of value is "minority" and "non-marketable."

45.   "Equity value" is the "enterprise value" of a company, plus its cash and less its interest-bearing debt; the "enterprise value" of a company is the market value of invested capital.

46.   "Fair market value" is "[t]he price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."[20]  It is the prevailing standard of value in business valuation, including business litigation.

---

[20] American Society of Appraisers, *Business Valuation Standards, Glossary*.
http://www.appraisers.org/docs/default-source/discipline_bv/bv-standards.pdf?sfvrsn=0  This definition and those that follow are drawn from the International Glossary of Business Valuation Terms as adopted by American Institute of Certified Public Accountants, American Society of Appraisers, National Association of Certified Valuation Analysts, The Canadian Institute of Chartered Business Valuators, and The Institute of Business Appraisers.

13

CONFIDENTIAL                                                    TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

47.     A "going concern" is an ongoing business enterprise.[21]  Second Measure raised capital in 2015 in order to develop its product and sell to prospective customers and it had cash on hand to continue operations as of March 31, 2016.[22]

48.     "Minority interest" is an ownership of less than 50% of the voting securities of a company and is subject to a discount for lack of control.[23]  "Marketability" is the ability to quickly convert property to cash at minimal cost and a non-marketable security is subject to a discount for lack of marketability.[24]  If Kim is determined to have equity interest in Second Measure as of March 31, 2016, his ownership stake will be less than 50% (meaning that it will not be a control interest) because there were other shareholders (founders and investors) in the Company with substantial equity interests and his ownership will not be liquid because the shares of the Company were not freely tradeable.[25]

B.     Valuation Procedure

49.  I performed a review of the Company, its business, financial performance, market and competitors, the general economy, and other relevant matters; see Sections D through G.

50.     I used a multi-stage process to determine the fair market value of a minority, non-marketable stake in the equity of Second Measure as of March 31, 2016.  I first calculated the enterprise value of the entire Company using an accepted valuation approach.  Because Second Measure was at an early stage of development, most valuation approaches could not be used; however, one approach did provide a reliable indication of enterprise value.  I adjusted the result for cash and interest-bearing debt to calculate the value of Second Measure's equity as of the Valuation Date.

C.     Valuation Approaches Considered and Selected

---

[21] American Society of Appraisers, *Business Valuation Standards, Glossary*.
http://www.appraisers.org/docs/default-source/discipline_bv/bv-standards.pdf?sfvrsn=0
[22] Interview with Mike Babineau, June 28, 2016.
[23] American Society of Appraisers, *Business Valuation Standards, Glossary*.
http://www.appraisers.org/docs/default-source/discipline_bv/bv-standards.pdf?sfvrsn=0
[24] American Society of Appraisers, *Business Valuation Standards, Glossary*.
http://www.appraisers.org/docs/default-source/discipline_bv/bv-standards.pdf?sfvrsn=0
[25] Interview with Mike Babineau, June 28, 2016.

CONFIDENTIAL                                                          TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

51.   In order to determine the value of Second Measure as of March 31, 2016, I considered various valuation approaches and methodologies.  I have followed the guidance of authoritative valuation texts and treatises and my knowledge and experience in the valuation of businesses.

52.   Although many valuation methods are used in practice, all such methods may be classified as variations of one of three approaches: Income Approach, Market Approach, and Asset Approach.  Within each approach, there are a variety of methods[26] used to estimate the fair market value of a business.  The following section contains a brief overview of the theoretical basis of each approach, as well as a discussion of the specific methodologies relevant to the analyses which I have performed.

53.   The Income Approach is based on the premise that the value of a business is the present value of its anticipated future cash flows.

54.   Methods within the Income Approach include capitalization of cash flow methods and discounted future cash flow methods.  In capitalization of cash flow methods, a representative cash flow level is divided or multiplied by an appropriate capitalization factor to convert the benefit to value.  In discounted future cash flow methods, specific cash flows are projected for discrete periods and then discounted back to a present value, taking into account the time value of money and the risk inherent in the projections.

55.   The Market Approach is based on the premise that a business can be valued by comparing it to other companies which are being acquired or which are publicly traded.  It involves estimating the value of a business by looking at actual transactions in the equity of similar companies, whether the transactions are trading in the shares of such companies or the acquisition of such companies.

56.   Two valuation methods utilized within the Market Approach are the Guideline Public Company ("GPC") Method and the Guideline Merger and Acquisition

---

[26] The term "method" comes from the American Institute of Certified Public Accountants' ("AICPA") Statement on Standards for Valuation Services.  This is generally equivalent to the Financial Accounting Standards Board's ("FASB") term "technique", as it refers to a specific way to determine value within a valuation approach.

CONFIDENTIAL                                                    TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

("M&A") Transaction Method.  In general, the Market Approach takes observed multiples from publicly traded companies or from M&A transactions and applies those multiples to the near-term historical or near-term projected financial results for a company.

        a.    The Guideline Public Company Method involves searching for publicly traded companies similar to the company being valued.  Multiples of revenue or earnings before interest, taxes, depreciation, and amortization ("EBITDA") are calculated for the similar companies and then applied to the company being valued.

        b.    The Guideline M&A Transaction Method involves searching for recent M&A transactions involving companies similar to the business being valued.  Multiples of revenue or EBITDA are calculated for the identified transactions and then applied to the company being valued.

    57.    The Asset Approach is based on the premise that the value of a business is the cost of replacing all of the assets of that business, both tangible and intangible.  It involves estimating the cost of reproducing or replacing all property in the business, less depreciation for physical deterioration and functional obsolescence.

    58.    After considering the three valuation approaches, I decided to utilize the Market Approach to value Second Market.  I decided not to use the Income Approach because the Company had not yet established a reproducible sales approach or even hired a sales force and management could not yet forecast future financial performance with any reasonable level of assurance.  I decided not to use the Asset Approach because the Company owned few tangible assets (most of its value was in intangible assets) and these are more appropriately valued using other valuation approaches.

    D.    Applying the Market Approach: Guideline Public Company Method

    59.    Whenever possible, guideline public companies are selected because they resemble the subject company both in products offered and financial condition.  However, it sometimes is challenging to find guideline public companies from the same product market (especially when dealing with emerging growth companies) and with the same financial

CONFIDENTIAL                                    TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

characteristics (size, growth rate, profitability, etc.), so judgment must be used in selecting companies and multiples.

60.     I searched the Standard and Poor's Capital IQ ("CapIQ") database of more than 60,000 publicly traded companies for suitable comparables.  The screens I implemented in performing this search are shown below:

| Order | Screen | Number of Companies that Passed Screen |
|---|---|---|
| 1 | In the CapIQ database | 61,334 |
| 2 | Traded on a major exchange[27] | 25,193 |
| 3 | Positive market capitalization as of March 31, 2016 | 23,313 |
| 4 | Classified under SIC codes: 7370 (Computer programming, data processing, and other computer related services) or 7372 (Prepackaged software) or 7373 (Computer integrated systems design) or 7374 (Data processing and preparation) | 1,561 |
| 5 | Business description contains the term: "analy*" [the * symbol is a wildcard for a variety of different word endings] | 403 |
| 6 | Business description contains the term: "bank*" or ""invest*" | 117 |
| 7 | Business description contains the term: "research" or "deci*") | 32 |

61.  Through the application of these screens I identified 32 potential companies which could be comparable to Second Measure.  Of the 32 companies, 28 were either not directly comparable to Second Measure or they were too large and diviersified to be

---

[27] As defined by Capital IQ, major exchanges include NYSE, NasdaqCM, NasdaqGM, NasdaqGS, AMEX, DB, LSE, TSE, ASX, TSX, VIRTX, SEHK, ENXTPA, TSEC, OM, SWX, BOVESPA, ENXTBR, CM, ENXTAM, and CATS.

CONFIDENTIAL                                                    TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

comparable to Second Measure. The excluded companies were: Cognizant Technology Solutions; Coheris; comScore; Co-Star Group; Dion Global Solutions; Ellie Mae; EPAM Systems; Exlservice Holdings; FactSet Research Systems; Genpact; IFIS Japn; HIS; Innodata; Integrated Research; Median Technologies; National Agricultural Holdings; Nice; Ramco Systems; Raminfo; Real Esate Investar Group; Reis; Sankhya Infotech; Shenzhen Yastech Info-Tech; TheStreet; Tungsten; Virtusa; Wipro; and WNS Holdings.

62. After eliminating these 28 companies, I analyzed the four remaining qualified guideline public companies: Asiakastieto Group; Fair Isaac' Morningstar; and Value Line. See Exhibit 3.

63. These guideline public companies were reviewed in detail to assess their operating and financial performance. This analysis considered the need to restate their financial results to adjust for any non-recurring or extraordinary items, if applicable. The financial performance of the guideline public companies was analyzed to assess patterns and trends of the businesses, to look for anomalies, and to gain an understanding of their values relative to recent financial results, where available.

64. I performed an analysis which compared Second Measure to the guideline public companies, examining size, liquidity, financial leverage, profitability, growth, and other factors. I observed that for the guideline public companies the last twelve month ("LTM") revenues ranged between approximately $34 million and $849 million, that the median projected revenue growth was approximately 3.5% over the LTM, and that the median EBITDA margin was 27.7% during the same period. By comparison, the Company was ███ ████████████████████████████████████████████████ See Exhibit 5.

65. The group of guideline public companies had LTM revenue multiples ranging between 4.1x and 5.9x, with a mean of 4.8x and a median of 4.6x. (Because the Company had ████████████████████████, no appropriate indication of value could be determined using an EBITDA multiple.) I selected a LTM revenue multiple of ███ based on an analysis of the multiples for the group of guideline public companies. This multiple was selected based on a qualitative analysis of the Company, relative to the guideline public companies, with respect to size, risk, growth, and margins. While Second Measure could be

18

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

expected ██████████ than the guideline public companies were growing, the Company was forecast to be ████████████ than the guideline public companies for the foreseeable future and it was unclear when – if ever – the Company would ██████████████. Accordingly, I selected a multiple below the mean and the median for the group of guideline public companies.

###### E.   Applying the Guideline M&A Transaction Method

66.  Whenever possible, guideline M&A transactions are selected because they resemble the subject company both in products offered and financial condition.  However, it sometimes is challenging to find guideline M&A transactions for which sufficient data are available, which occurred within a relevant time frame, which serve the same product market (especially when dealing with emerging growth companies), and which have the same financial characteristics (size, growth rate, profitability, etc.), so judgment must be used in selecting companies and multiples.

67.  I searched the CapIQ database of more than 700,000 M&A transactions for suitable comparable companies.[28]  The screens I implemented in performing this search are shown below:

| Order | Screen | Number of Transactions that Passed Screen |
|---|---|---|
| 1 | In the CapIQ database | 704,989 |
| 2 | Acquisition of majority stake | 594,820 |
| 3 | Current transaction status is announced, closed, or effective | 562,955 |
| 4 | Transactions announced between June 1, 2001 and May 31, 2016 | 227,860 |

---

[28] While I ordinarily attempt to use the same search screens, including search terms, when looking for GCPs and M&A transactions, often no M&A transactions or only a few M&A transactions will emerge.  In that case, I must use different search terms to broaden the search.  In this case, a first pass using the same search terms employed when looking for GCPs produced only M&A transactions that were not comparable, so I broadened the search.

CONFIDENTIAL                                                   TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

| 5 | Target located in US | 89,628 |
| 6 | Business description contains the term: "analytics," "analysis," "business intelligence," or "credit solutions" | 4,224 |
| 7 | Business description contains the term: "decision management," "decision making," "consumer information," "tax and accounting," "financial information," "credit services," or "network and security" | 98 |
| 8 | Implied target enterprise value ÷ revenue greater than 0 or enterprise value ÷ EBITDA greater than 0 | 7 |

68.   Through the above process, I identified seven potential transactions to consider in my analysis.  However, I excluded two transactions (Walgreens Boots acquisition of Rite Aid and Raytheon Missile Systems acquisition of Ktech) because the target companies were not in similar lines of business.  Therefore, five transactions were considered in my analysis.

69.   The five target companies (Advanstar Communications; Dodge Data and Analytics; Cognigen; Shoom; and Coalition Development) had LTM revenues (as of the transaction date) between approximately $4 million and $291 million.  See Exhibit 9.  These guideline M&A transactions were reviewed in detail to assess their operating and financial performance.

70.   I performed an analysis that compared the Company to the target companies in the M&A transactions, examining timing, size, liquidity, financial leverage, profitability, growth, and other factors.

71.   The group of target companies had LTM revenue multiples that ranged from 1.2x to 3.6x and had median and mean LTM revenue multiples of 1.5x and 1.9x, respectively.

72.   Because the multiples implied by the transactions in the Market Approach: Guideline M&A Transaction Method varied significantly more widely than those from the Market Approach:  Guideline Public Company Method, I determined that these transactions would not provide an appropriate indication of value for the Company (although they served to

20

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

support the LTM revenue multiple which I selected and higher indication of value produced by the Market Approach:  Guideline Public Company Method).

F.   Weighting of Approaches and Single Point Determination of Value

73.   I placed all weight on the value indication implied by the Market Approach: Guideline Public Company Method, which produced a Second Measure enterprise value of approximately $▮▮▮▮▮ as of March 31, 2016.   I converted this enterprise value to an equity value by making adjustments for Second Measure's cash and interest-bearing debt of approximately $▮▮▮▮▮ and $▮▮▮▮, respectively.[29]   This resulted in an equity value of approximately $▮▮▮▮▮.  See Exhibit 1.

G.   Application of Discounts for Lack of Control and Lack of Marketability

74.   Business valuation practitioners are required to consider the levels of control and marketability inherent in an ownership interest.

75.   Because I did not rely on the valuation implied by the Market Approach: Guideline M&A Transactions I did not have to remove the incremental value attributable to the control premium inherent in such transactions.

76.   As of March 31, 2016, Second Measure was privately-held and shares of common stock therefore were non-marketable.   The inability to readily sell shares of a company increases the owner's exposure to changing market conditions and increases the risk of ownership.  Because of the lack of marketability and the resulting increased risk associated with ownership of a privately-held stock, an investor typically demands a higher return in comparison to a similar but publicly-traded stock.

77.   There are a variety of restricted stock studies, summarized in the table below, which have examined the difference in prices paid for restricted stocks and their unrestricted, freely traded counterparts.  An owner of restricted stock, also known as "letter stock" or "Rule 144 stock," is restricted from selling the stock in the public market until a certain period lapses, at which time the stock becomes fully marketable.   In general, the restricted stock studies

---

[29] Second Measure, Balance Sheet, March 31, 2016.

CONFIDENTIAL                                                                              TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

indicate that restricted stocks trade at a discount from the prices of their freely traded counterparts because of their restricted marketability.  As shown in the table below, the mean discount for lack of marketability indicated by these studies ranged from 13% to 45%.[30]

| Restricted Stock Study | Average Price Discount |
|---|---|
| SEC Institutional Investor Study (Overall Average) | 26% |
| Milton Gelman Study | 33% |
| Robert Trout Study | 34% |
| Robert E. Moroney Study | 36% |
| J. Michael Maher Study | 35% |
| Standard Research Consultants Study | 45% |
| Willamette Management Associates Study | 31% |
| William L. Silber Study | 34% |
| FMV Opinions, Inc. Study | 23% |
| Bruce Johnson Study | 20% |
| Columbia Financial Advisors, Inc. Studies | 13-21% |

78.  While the companies in these studies were large enough and mature enough to become publicly traded within a short amount of time (many in less than one year), Second Measure was not large enough or mature enough to be ready for public trading in the foreseeable future.  In consideration of this, I selected a discount for lack of marketability of 30% to apply to any minority equity interest.  Accordingly, the fair market value of a 1% equity ownership position in Second Measure as of March 31, 2016 would be $███ on a minority, non-marketable basis.

---

[30] SEC study from "Discounts Involved in Purchases of Common Stock (1966-1969)," *Institutional Investor Study Report of the Securities and Exchange Commission,* H.R. Doc. No. 64, Part 5, 92nd Congress, 1st Session, 1971, pp. 2444-2456. Gelman Study from Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company," *Journal of Taxation*, June 1972, pp. 353-354.  Trout Study from Robert R. Trout, "Estimation of the Discount Associated with the Transfer of Restricted Securities," *Taxes*, June 1977, pp. 381-385. Moroney Study from Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes*, March 1973, pp. 144-154.  Maher Study from Michael Maher, "Discounts for Lack of Marketability for Closely-Held Business Interests," *Taxes*, September 1976, pp. 562-571.  Standard Research Consultants Study from "Revenue Ruling 77-287 Revisted," *SRC Quarterly Reports*, Spring 1983, pp. 1-3.  Willamette Management Study from Shannon P. Pratt and Alina V. Niculita, *Valuing a Business the Analysis and Appraisal of Closely Held Companies,* 5th ed. New York: McGraw-Hill, 2008, p. 415.  Silber Study from William L. Silber, "Discounts on Restricted Stock:  The Impact of Illiquidity on Stock Prices," *Financial Analysis Journal*, July-August 1991, pp. 60-64.  Management Planning Study from Z. Christopher Mercer, "Analysis of Restricted Stock of Public Companies," *Quantifying Marketability Discounts*, 1997, pp. 345-370.

CONFIDENTIAL                                                          TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

## VIII.   VALUATION OF EQUITY OF PROJECT RECON AS OF SEPTEMBER 15, 2014

A.   <u>Status of Predecessor Entity</u>

79.    As of mid-September 2014, Kim, on the one hand, and Babineau and Chou, on the other hand, had worked together for a time; thereafter, they moved apart.  During the time that they had worked together, they had obtained access to a static, historical sample of consumer credit card transaction data from ███████ as part of a research project, whereby they were required to provide ██████ a report of research findings and assessment of the value of ██████ data within the context of any collaborative efforts or as requested by ██████. Specifically, ██████ did not permit Kim, Babineau, or Chou to use the data for commercial purposes, or even discuss or demonstrate how the data could be used with prospective customers or investors.  Babineau and Chou had written some software to attempt to clean and utilize the data and also had done some revenue "back testing" (i.e. checking for correlation between an extracted signal and reported company financials to see if revenue could be predicted).

80.  Arrayed against this, the individuals did not have a shared vision of what should be done next, they had no access to real time consumer credit card transaction data nor rights to use such data for commercial purposes, they had no funding to support product development and creation of marketing and sales, and they could not even agree about whether they should all leave their current full time jobs and commit to building Project Recon into a company.

81.  To have value in September 2014, Project Recon would need either:

a.    The ability to stand on its own, grow organically, and sustain itself financially; or

b.    The ability to raise external funds so that it could move toward the elements of i, above.

82.  Because Project Recon did not have a working product, access to a consumer credit data base, or customer relationships and sales, it did not have – and could not quickly

23

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

develop – the ability to stand on its own, grow organically, and sustain itself financially. Therefore, its only prospect for survival and, ultimately, to creating value, was to raise external funds.

83.   The primary sources of funding for early stage technology driven companies are angel investors and venture capital investors.  According to a survey by the Kauffman Foundation, about 10% of new firms raise outside equity in their first year of operation (the remainder use debt and/or are self-funded).  Funds from angel investors and venture capital investors were used by only a small proportion of these new firms, 2.7% and 0.6%, respectively.[31]

B.    Factors Considered by Venture Capitalists in Making an Investment

83.   Unlike most of other forms of institutional investing – for example, stock and bond investing – venture capital investing[32] is not based primarily on consideration of economic factors and a company's numbers but instead is based on a complex mix of elements.  Venture capitalists typically perform a review of many things before making an investment in a company in order to ensure that it meets the investment strategy and criteria of the fund.[33]

84.   Most venture capital investors say that a number of factors play a role in the ultimate success of an emerging growth technology company.  A typical short list would consist of management, market, technology, and competition.  Venture capitalists readily concede that no company would earn a perfect score for all of these attributes, but they look for strength in as many as possible and they may invest despite real weakness in one or another

---

[31] Alicia Robb, E.J. Reedy, Janice Ballou, David DesRoches, Frank Potter, and Zhanyn Zhao, An Overview of the Kauffman Firm Survey, Results from the 2004 – 2008 Data, May 2010,  p. 34.
http://www.kauffman.org/uploadedFiles/kfs_2010_report.pdf  Accessed on September 19, 2013.  The Kauffman Foundation survey uses a smaller set of companies than the US Census Bureau BDS data because the BDS data includes may establishments with only one to ten employees.
[32] There are almost no data available about angel investments, largely because most angel investors are individuals who invest occasionally and do not participate in any sort of organization which would allow for reliable data gathering.  However, because angel investors otherwise behave a lot like venture capital investors, it is safe to use extrapolate that what is true for venture capital investments will largely be true for angel investments.
[33] Justin J. Camp, *Venture Capital Due Diligence:  A Guide to Making Smart Investment Choices and Increasing Your Portfolio Returns* (New York, NY, John Wiley & Sons, 2002), p. 1.

CONFIDENTIAL                                                TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

attribute (but not if there is weakness in many attributes and almost certainly not if management is one of weak attributes).

85.   Almost without exception, every list ranks management first, citing it as the most important factor to be examined in assessing the potential of an investment.  Arthur Rock, the venture backer of Apple Computer, Intel, Teledyne, and a number of other significant Silicon Valley company, stressed the supreme importance of the management team in an interview:

> "After all, a good idea, unless it's executed, remains only a good idea.  Good managers, on the other hand, can't lose.  If their strategy doesn't work, they can develop another one.  If a competitor comes along, they can turn to something else.  Great people make great companies …."[34]

In the same interview he also said that he "generally pays more attention to the people who prepare a business plan than to the proposal itself."[35]

86.   Other venture capitalists say similar things.  John Doerr, the venture backer of Amazon.com, Google, Netscape, Quicken, Sun, and a number of other companies stresses the importance of the management team:

> "In the world today, there's plenty of technology, plenty of entrepreneurs, plenty of money, plenty of venture capital.  What's in short supply is great teams.  I always turn to the biographies of the team first. For me, it's team, team, team.  Others might say, people, people, people – but I'm most interested in the **team** as a whole."[36]

87.   Even the lawyers who structure deals for venture capitalists stress the importance of management over all other factors.  For example, one of the leading handbooks used for deal structuring, edited by two senior partners at Kirkland & Ellis and a law school professor at Georgetown University, lays out six features which distinguish venture capital or private equity investing from other forms of investing.  In one of these they note:

> "A *fifth* distinguishing feature of venture capital / private equity investing is that VC generally invests in a portfolio company only when convinced that the company has (or that the VC has recruited) a superior

---

[34] Arthur Rock, "Strategy v. Tactics from a Venture Capitalist," *Harvard Business Review* (November-December 1987), p. 5.
[35] *Ibid.* p. 1.
[36] Michael S. Malone, "John Doerr's Startup Manual," *Fast Company*, www.fastcompany.com/online/07/082doerr.html.  Emphasis added.

CONFIDENTIAL                                     TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

management team.  VC generally cannot be induced to put its money behind a management team in which it does not have confidence, no matter how attractive the portfolio company's product, concept, or business plan.  A frequently heard VC maxim is that an attractive portfolio company has three key attributes:  superior management, superior management, and superior management.

When VC disregards this maxim and backs weak management, the VC too often is faced with an unpalatable choice before long:  *either* continue with the suboptimal management and risk the portfolio company's falling behind its business plan *or* fire management and seek better replacements, risking significant business disruption during which well-managed competitors will often overcome the portfolio company's early lead.  A second, but less obvious, reason to avoid weak management is that, when management must be replaced mid-stream, VC will spend an inordinate amount of time recruiting and training new management, diverting VC from its other portfolio companies."[37]

88.   The same sorts of statements are available about the other factors which are important to venture capital investors, including market, technology, and competition.

89.   There is widespread agreement in venture capital investing that a variety of factors must be evaluated in making an investment decision.   There also is widespread agreement among venture capital investors that a significant deficiency in any of these factors is a cause for concern – and significant deficiencies in more than a few of these factors is a reason not to invest in a company.

C.   Suitability of Project Recon for Venture Capital Investment

90.   Analyzed in light of the requirements for a venture capital investment, the individuals of Project Recon would have had no ability to raise external funding in September 2014.  They had not committed full time to the project, they were not acting as a cohesive team, they did not have a vision for the future of the project, and they lacked critical resources (access to real time consumer credit card data, a working version of proprietary software, and traction with customers, to name a few).

91.   Based on my experience as a venture capital investor and working with venture capital firms for most of my career, it is my professional opinion that Project Recon could not have raised external funding in September 2014 and, in the absence of such funding, would not have been able to sustain operations long enough to deal with the deficiencies described above.

---

[37] Jack S. Levin, Martin D. Ginsburg, and Donald E. Rocap, eds., *Structuring Venture Capital, Private Equity, and Entrepreneurial Transactions* (Gaithersburg, NY, Aspen Publishers, 2000), pp. I--6 (italics in original).

CONFIDENTIAL                                                                              TEKNOS ASSOCIATES

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

As a consequence, it is my professional opinion that Project Recon had no measurable value at that time.

I declare under penalty of perjury in accordance with the laws of the State of California that the foregoing is true and correct.

This Expert Report presents my opinions based on the facts of which I was aware at time of its preparation.  My opinions are subject to revision in light of additional facts and testimony that are presented before the date of deposition or trial.

Signed at Palo Alto, CA on July 1, 2016

Jim Timmins

27

**APPENDIX A**

**<u>Curriculum Vitae of Jim Timmins</u>**





**Jim Timmins,** **ASA BV/IA, MAFF, CEP**
**Managing Director**
**Teknos Associates**
jtimmins@teknosassociates.com
www.teknosassociates.com
350 Cambridge Ave, Suite 300
Palo Alto, CA 94306
650.330.8801

## General Qualifications

I have spent nearly 35 years working with companies, as an investment banker, a venture capitalist, and a valuation expert.

I have been retained as an expert in connection with more than 50 cases, by plaintiffs and defendants, in California Superior Court, Delaware Chancery Court, Florida Circuit Court, Massachusetts Superior Court, Rhode Island Superior Court, Texas State Court, Federal District Court (Districts of Delaware, Northern California, Southern California, and Southern New York), Bankruptcy Court, and Tax Court, plus specialized venues such as FINRA, International Court of Arbitration, and private mediation and arbitration. I have prepared expert reports, including rebuttal reports, been deposed, and given testimony in bench and jury trials and before single and multiple mediators and arbitrators, plus I have consulted on a variety of related subjects.

The subject matter of litigation has included:  business damages, business valuation, fairness, fiduciary duty, intellectual property valuation, investment banking practice, legal malpractice, lost profits, transfer pricing, venture capital practice, and similar matters.

I have worked with companies in a wide range of industry sectors, including:  biotech and pharmaceuticals, entertainment and gaming, financial services, healthcare, information technology, Internet services, renewable energy, and telecommunications.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

I am an Accredited Senior Appraiser in both business valuation and intangible valuation and a Master Analyst in Financial Forensics in business and intellectual property damages.  I also am a Certified Equity Professional in equity compensation.

# Work Experience

<u>Investment Banking, 1981-1990 and 2005-2008</u>

I began my career in 1981, as an investment banker at Salomon Brothers ("Salomon") in New York, NY, and San Francisco, CA.  I was part of a team working on corporate finance or merger and acquisition ("M&A") assignments for a variety of companies, including Advanced Micro Devices, Amfac, Bank of America, Bank of California, Bancorp Hawaii, Chrysler, Collagen, Crown Zellerbach, Georgia Pacific, Hewlett-Packard, Natomas, Ramada Inns and Tropicana Casinos, Sherwin Williams, Simpson Timber, and Varian Associates.

In 1984, I helped form a firm, McKewon & Timmins ("M&T"), in San Diego, CA.  I was a managing director, heading a team working on corporate finance and M&A assignments for a variety of companies, including CMS Enhancements, IDB Communications, Immunetech Pharmaceuticals, and Precision Aerotech.

In 1987, I was a principal at Hambrecht & Quist ("H&Q") in San Francisco, CA.  I managed a capital markets team and worked on corporate finance and M&A assignments for a variety of companies including Actel, Aspect Telecommunications, Integrated CMOS, Lattice Semiconductor, Novellus Systems, Octel Communications, Parametric Technology, Ramtron, Seeq, Sunward Technology, Vitelic, and Westwood One.

In 2005, after 15 years in venture capital, I returned to working in investment banking as a managing director at Pagemill Partners ("Pagemill").  I assisted with M&A for a variety of companies including Comarco (unit sold to Ascom), Delphi Automotive (unit sold to Wireless Matrix), Justsystems (purchased XMetaL), Inovys (sold to Verigy), and SensArray (sold to KLA-Tencor).  I also began to work extensively in valuation during this time.

<u>Venture Capital, 1990-2005</u>

From 1990 to 1998, I worked in venture capital at Glenwood Ventures and Glenwood Capital ("Glenwood").   I was a partner and made investments in a variety of companies including Artios (sold to Barco), Iwerks Entertainment (public), Magellan (sold to Orbital Sciences), Mattson Technology (public), Micronics (sold to Diamond Multimedia), Microtec (public, then sold to Mentor Graphics), OrCAD (public, then sold to Cadence Design), Paradigm (public), and Spea Software (sold to Diamond Multimedia).

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

From 1998 to 2005, I continued to work in venture capital at The Daiwa Securities Group, NIF Ventures ("NIF").  I was a managing director and made investments in a variety of companies including AccessLan (sold to Advanced Fibre Communications), Active Software (public, then acquired by webMethods), Ancore (acquired by OSI Systems), Backweb (public), CrossLogix (acquired by BEA Systems), Digital Island (public, then acquired by Cable & Wireless), enCommerce (acquired by Entrust), Knova (public, then acquired by Consona), NetContinuum (acquired by Barracuda Networks), Spectra Switch (acquired by Xtellus), WaveSplitter (private), Whistle Communication (acquired by IBM), Websense (public), and Zhone Technology (public).

Valuation, 1981-present

I have been dealing with the subject of valuation throughout my career as an investment banker, venture capital investor, and valuation expert.  As an investment banker at Salomon and H&Q, I prepared many valuations and fairness opinions.  And as a venture capitalist at Glenwood and NIF, I participated in the valuation of companies at investment and sale.

In 2005, when I joined Pagemill, I began to work more extensively as a valuation expert, participating in approximately 200 valuations and fairness opinions.  I founded my current firm, Teknos Associates ("Teknos"), in 2008 to work full time on valuation and transaction advisory projects.  Since then I have participated in more than 2,500 additional valuations and fairness opinions.

Notable companies for which I have provided valuation or fairness support recently include: A10 Networks (public), AcelRx (public), Alder Biopharmaceuticals (public), Algotochip (acquired by Nitto Denko), All Covered (acquired by Konica Minolta), Ambarella (public), Amber Road (public), Anthera Pharmaceuticals (public), Apptus, Aquinox Pharmaceuticals (public), Auditude (acquired by Adobe), AuthenTec (public, then acquired by Apple Computer), Barracuda Networks (public), BioAmber (public), BrightRoll (acquired by Yahoo!), Capnia (public), Carbon 3D, Catalina Marketing, Centillium (acquired by TranSwitch), Chestnut Medical (acquired by ev3), DeNA (public), Edison Pharmaceuticals, Funzio (acquired by Gree), Honest Company, Hyperion Therapeutics (public, then acquired by Horizon Pharma), Ikaria Pharmaceuticals (acquired by Mallinckrodt), Inphi (public), InQuira (acquired by Oracle), IntoNow (acquired by Yahoo!), JustFab, Link_A_Media (acquired by Hitachi), MarketRx (acquired by Cognizant), Maxygen (public), Merchant e-Solutions (acquired by Cielo), Meru Networks (public, then acquired by Fortinet), Nature's Products, Nordic Windpower, Ooma (public), PSS Systems (acquired by IBM), RealAge (acquired by Hearst), Savvion (acquired by Progress Software), SayNow (acquired by Google), Securent (acquired by Cisco), Sinochem, Siperian (acquired by Informatica), Stratalight (acquired by Opnext), Techwell (public, then acquired by Intersil), T2 Biosystems (public), Thumbtack, Tremor Media (public), Ultragenyx Pharmaceuticals (public), Uptake Networks (acquired by Groupon), Virsto (acquired by VMware), VistaGen (public), WideOrbit, Xenon Pharmaceuticals (public), YuMe (public), and Zscaler.

HIGHLY CONFIDENTIAL-ATTORNEYS' ONLY

## Investing and Boards of Directors

During my career, I have evaluated many hundreds of private companies for private financing, public financing, or M&A.  I have participated in more than 100 private financing transactions, more than 50 public financing transactions, and more than 30 M&A transactions.  I also have been a member of the board of directors, audit committee, and/or compensation committee of more than 15 private and public companies.

I have been involved in all stages of company life, from start-up through initial public offering or acquisition, and in most aspects of early stage company development, including strategic planning, management recruiting, market, technology, and intellectual property evaluation, corporate partnering, fund raising, and M&A.  I have been involved in analysis, structuring, valuation, and due diligence review of all aspects of deals.

I have extensive experience in transactions, including debt and equity financings, mergers, acquisitions, and spin-offs.  I have been involved in deal marketing (private and public, domestic and foreign), terms negotiation (non-disclosure, no shop and go shop, break up, representations and warranties, indemnification, etc.), transaction structuring (stock or asset, escrow, earnout, etc.), due diligence review, and closing.

## Teaching, Speaking, and Publication

I have been a guest lecturer about technology company and venture capital transactions at the: Boalt Hall School of Law and Haas School of Business, University of California at Berkeley; School of Law, Santa Clara University; Graduate School of Business, Stanford University; and Wharton School, University of Pennsylvania.  I have been an instructor for the Practicing Law Institute ("PLI"), teaching continuing education programs for lawyers about term sheet negotiation.  And I have been a speaker about other technology company and venture capital issues at numerous conferences and industry associations in the US and abroad.

I annually contributed to the PLI publication series, "Doing Deals:  Understanding the Nuts and Bolts of Transactional Practice" (later renamed "Doing Deals:  Keeping Pace with a Rapidly Changing Market") from 1998 to 2004.

## Education and Accreditation

I hold a BA from Trinity College, University of Toronto, and a MBA from the Graduate School of Business, Stanford University.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

I have earned the designations, Accredited Senior Appraiser in both Business Valuation and Intangible Assets ("ASA BV/IA") from the American Society of Appraisers, and Master Analyst in Financial Forensics ("MAFF") in Business and Intellectual Property Damages, from the National Association of Certified Valuators and Analysts.  I also am a Certified Equity Professional ("CEP"), from the Certified Equity Professional Institute of Santa Clara University.  I am current in the requirements for continuing education to maintain all four designations.

## Alternative Dispute Resolution

I have been retained to serve as a neutral or third appraiser in connection with several matters, including:
- Health Product Holding and Kahler (in connection with the buyout of the ownership interest of the departing CEO in Rainbow Light Nutritional Systems, selected by the two parties, 2009)
- Swick and LyChron (in connection with the buyout of the ownership interest of a departing manager of LyChron, selected by counsel for the two parties, 2011)
- Nedd and Horizon Home Health Care Services (as part of the settlement of *Nedd v. Friar*, California Superior Court, selected by the two appraisers, 2014)

## Expert Witness Retention

The cases for which I have been retained include:
- *Intec Video Systems v. Pillsbury Madison & Sutro* (California Superior Court, on behalf of Pillsbury Madison & Sutro ("Pillsbury"), retained by Pillsbury,1989)**
- *Minority shareholders v. Chroma Graphics and Draper Fisher Jurvetson* (California Superior Court, on behalf of Chroma and DFJ, retained by Cooley Godward Castro Huddelson & Tatum ("Cooley"), 2001)*
- *Bertelsmann Ventures v. BV Management* (Federal District Court, on behalf of BV Management, retained by Cooley, 2003)
- *E-Compare v. Heller Ehrman White & McAuliffe* (California Superior Court on behalf of Heller Ehrman, retained by Keker & Van Nest, 2004)*
- *ZF Micro Solutions v. National Semiconductor* (California Superior Court, on behalf of National Semiconductor, retained by Keker & Van Nest, 2005)*
- *Zutaut, et al v. Fish & Richardson* (California Superior Court, on behalf of Fish & Richardson, retained by Keker & Van Nest, 2006)
- *Waltrip, et al v. Kimberlin and Spencer Trask* (California Superior Court, on behalf of Waltrip, retained by Sedgwick Detert, 2008)**
- *Shum v. Intel, Verdiell, and LightLogic* (Federal District Court, on behalf of Intel, Verdiell, and LightLogic, retained by Taylor & Company and Keker & Van Nest, 2008)**
- *Brown v. Wells Fargo* (binding FINRA arbitration, on behalf of Wells Fargo, retained by Wells Fargo, 2009)

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

- *Alexandros, et al v. KOR Electronics and New Enterprise Associates* (binding civil arbitration, on behalf of KOR and NEA, retained by KOR, 2010)**
- *Pelowski, et al v. Shell Internet Ventures and Thomas H. Lee Partners* (California Superior Court, on behalf of Pelowski and Currenex, retained by Cotchett Pitre & McCarthy, 2010)*
- *Ryan, Predictive Diagnostics, and Large Scale Biology v. Levine et al* (California Superior Court, on behalf of Ryan, Predictive Diagnostics, and Large Scale Biology, retained by Burnham Brown, 2010)*
- *Quercus Trust v. LiveFuels, Morgenthaler, and Jones* (California Superior Court, on behalf of LiveFuels, retained by Cooley and Keker & Van Nest, 2011)*
- *Parrish and Fitzgibbons v. FLIR Systems* (California Superior Court, on behalf of FLIR Systems, retained by Bickel & Brewer, 2011)
- *Chloe, Alfred Dunhill, Officine Panerai, and Montblanc v. SISCOM and TradeKey* (Federal District Court, on behalf of SISCOM and TradeKey, retained by Fenwick & West, 2011)
- *Futuredontics v. Elexity Systems and Scherzay* (binding civil arbitration, on behalf of Scherzay, retained by the Butler Law Firm, 2012)**
- *My485 v. Riverside Partners and HealthcareFirst* (Texas State Court, on behalf of My485, retained by Friedman & Feiger, 2012)*
- *In re Trados Shareholder Litigation* (Delaware Chancery Court, on behalf of SDL/Trados, retained by Wilson Sonsini Goodrich & Rosati ("WSGR"), 2012)*
- *NES Financial v. JPMorgan Chase Bank* (Federal District Court, on behalf of NES Financial, retained by MoloLamkin, 2012)**
- *AmerisourceBergen, et al v. Raintree, et al* (Texas State Court, on behalf of AmerisourceBergen, retained by Strasburger & Price, 2012)
- *Technology Properties, et al v. Marcoux, et al* (California Superior Court, on behalf of Technology Properties, retained by Ropers Majeski Kohn & Bentley, 2012)
- *Albrick v. Rainbow Disposal, et al* (California Superior Court, on behalf of Albrick, retained by Klein & Wilson, 2012)*
- *Small Business Administration v. Novus Ventures* (Federal District Court, on behalf of Novus Ventures, retained by Cooley, 2012)
- *Arellano v. Flywheel Networks* (California Superior Court, on behalf of Flywheel Networks, retained by Villarreal Hutner & Todd, 2012)
- *Iguaçu v. Cabrera* (Federal District Court, on behalf of Cabrera, retained by K&L Gates, 2012)**
- *Thomas v. Del Biaggio, Sand Hill Capital, Neilson, and Thomvest Holdings* (United States Bankruptcy Court, on behalf of Thomvest Holdings, retained by Durie Tangri, 2012)
- *Amazon.com v. Commissioner* (United States Tax Court, on behalf of the Internal Revenue Service, retained by US Treasury, 2012)**
- *Veritas Cambridge Fund, Velocity Partners Fund, and Vector Calculus Fund v. Commissioner* (United States Tax Court, on behalf of an undisclosed taxpayer, retained by Kilpatrick Townsend & Stockton, 2013)

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

- *White Oak v. Duff and Dowling* (binding civil arbitration, on behalf of Duff and Dowling, retained by Keker & Van Nest, 2013)**
- *Goodman, et al v. Groupe SEB, Key Ingredient, et al* (Federal District Court, on behalf of Groupe SEB and Key Ingredient, retained by Buchanan Ingersoll & Rooney, 2013)
- *Miller v. Peterson* (California Superior Court, on behalf of Miller, retained by Biggs Law Offices, 2013)**
- *Patterson v. Geico* (binding civil arbitration, on behalf of Geico, retained by Edrington Schrimer & Murphy, 2013)**
- *Entelos Creditors Committee v. Goggin, et al* (Federal District Court, on behalf of the Creditors Committee, retained by Goodin MacBride Squeri Day & Lamprey, 2013)*
- *Rhapsody International v. Lester and Napster.FM* (on behalf of Lester and Napster.FM, retained by Brundidge & Stanger, 2013)
- *Wang v. Palo Alto Networks, et al* (Federal District Court, on behalf of Palo Alto Networks, retained by Taylor & Company, 2013)
- *In re Marriage of Richardson* (California Superior Court, Family Division, to value Vibrant Technology, 2013)**
- *Flynn v. Stitch Fix and Lake* (California Superior Court, on behalf of Stitch Fix and Lake, retained by Taylor & Company, 2014)
- *Bricolage Capital v. Commissioner* and *Delta Currency Trading v. Commissioner* (United States Tax Court, on behalf of Bricolage Capital and Delta Currency Trading, retained by Katsky Korins, 2014)
- *Luttrull v. Avery, et al* (California Superior Court, on behalf of Luttrull, retained by Tesser Ruttenberg & Grossman, 2014)
- *Shareholder Representative Services (obo Solaicx Securityholders) v. SunEdison (fka MEMC Electronic Materials)* (binding civil arbitration, on behalf of Shareholder Representative Services, retained by Durie Tangri, 2014)**
- *Newell, et al v. YapStone, Golis, et al (*California Superior Court, on behalf of Newell, retained by Valorem Law Group, 2014)*
- *Rhode Island Economic Development Corporation v. Wells Fargo, Barclays Capital, First Southwest, et al* (Rhode Island Superior Court, on behalf of Wells Fargo, Barclays Capital, First Southwest, retained by K&L Gates and Latham & Watkins, 2014)
- *NHB Assignments v. General Atlantic and Kelly* (Federal District Court, on behalf of NHB Assignments and the Creditors Committee, retained by Klafter Olsen & Lesser, 2014)
- *Pillsbury v. Bewley, Stratvue, South Milhausen, Popper, et al* (Florida Circuit Court, on behalf of South Milhausen and Popper, retained by Grower Ketcham, 2014)
- *Nitzkin v. Petersen-Dean Solar* (binding civil arbitration, on behalf of Petersen-Dean Solar, retained by Hopkins & Carley, 2015)
- *Mulligan v. Goldman and Relationship Science* (binding civil arbitration, on behalf of Goldman and Relationship Science, retained by WSGR, 2015)*
- *von Schönau v. Rothschild Bank, et al* (Massachusetts Superior Court, on behalf of von Schönau, retained by Dentons, 2015)

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

- *Sumitomo Electric Industries v. Emcore* (International Court of Arbitration, on behalf of Emcore, retained by Bird Marella, 2015)
- *EpicHR v. Alves* (California Superior Court, on behalf of Alves, retained by Hefner Stark & Marois, 2015)*
- *Bell v. Reznicsek Fraser White & Shaffer (*Florida Circuit Court, on behalf of Reznicsek Fraser White & Shaffer, retained by Grower Ketcham, 2015)
- *Backflip Software v. Cisco Systems, et al* (California Superior Court, on behalf of Backflip Software, retained by Hosie Rice, 2015)
- *Zilincik, et al v. Tesla Motors* (California Superior Court, on behalf of Tesla Motors, retained by Morrison & Foerster, 2015)**
- *Platt v. Sky Zone, et al* (American Arbitration Association, on behalf of Sky Zone, retained by Dentons, 2016)
- *Davidson v. United States of America and United States Postal Service (*Federal Claims Court, on behalf of Davidson, retained by Pisanelli Bice, 2016)
- *Pfeifer and Dorley v. Wawa, Inc., and Retirement Plans Committee of Wawa, Inc., et al* (Federal District Court, on behalf of Pfeifer, retained by Feinberg Jackson Worthman & Wasow, 2016)
- *Second Measure v Kim,* (Federal District Court, on behalf of Second Measure, retained by Dhillon Law Group, 2016)

In addition, I have been retained by the US Treasury (Internal Revenue Service) on another valuation matter, for United States Tax Court, which cannot be disclosed.

_____

*Deposition

**Trial or arbitration hearing

2016-06-22

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

# APPENDIX B

## Documents Relied Upon and Other Information Considered

HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

# APPENDIX B

**Books and Articles**

"Discounts Involved in Purchases of Common Stock (1966-1969)," *Institutional Investor Study Report of the Securities and Exchange Commission,* H.R. Doc. No. 64, Part 5, 92nd Congress, 1st Session, 1971.

"Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983.

Alicia Robb, E. J. Reedy, Janice Ballou, David DesRoches, Frank Potter, and Zhanyn Zhao, *An Overview of the Kauffman Firm Survey,* Results from the 2004 – 2008 Data, May 2010.

Arthur Rock, "Strategy v. Tactics from a Venture Capitalist," *Harvard Business Review* (November-December 1987).

*Economic Outlook Update*, 1Q 2016, published by Business Valuation Resources, LLC, 2016.

Jack S. Levin, Martin D. Ginsburg, and Donald E. Rocap, eds., *Structuring Venture Capital, Private Equity, and Entrepreneurial Transactions* (Gaithersburg, NY, Aspen Publishers, 2000).

Justin J. Camp, *Venture Capital Due Diligence:  A Guide to Making Smart Investment Choices and Increasing Your Portfolio Returns* (New York, NY, John Wiley & Sons, 2002).

Management Planning Study from Z. Christopher Mercer, "Analysis of Restricted Stock of Public Companies," *Quantifying Marketability Discounts*, 1997.

Michael Maher, "Discounts for Lack of Marketability for Closely-Held Business Interests," *Taxes*, September 1976.

Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company," *Journal of Taxation*, June 1972.

Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes*, March 1973.

Shannon P. Pratt and Alina V. Niculita, *Valuing a Business the Analysis and Appraisal of Closely Held Companies,* 5th ed. New York: McGraw-Hill, 2008.

Trout Study from Robert R. Trout, "Estimation of the Discount Associated with the Transfer of Restricted Securities," *Taxes*, June 1977.

William L. Silber, "Discounts on Restricted Stock:  The Impact of Illiquidity on Stock Prices," *Financial Analysis Journal*, July-August 1991.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**Pleadings**

Complaint, June 4, 2015

Kim's Answer to Complaint and Counterclaims, August 3, 2015

Parties Answer and Counterclaims, May 8, 2015, filed December 15, 2015

Kim's Answer to Counterclaims, December 31, 2015, filed December 31, 2015

**Documents**

Second Measure, Certificate of Incorporation, filed January 14, 2015

Second Measure Bylaws, March 27, 2015

Second Measure, Balance Sheet, January 2015 to March 2016

Second Measure, Profit and Loss, January 2015 to March 2016.

Second Measure Quarterly Profit and Loss, January 2015 to March 2016

Second Measure, Balance Sheet, March 31, 2016.

Second Measure, Capitalization Table Equity Schedule, October 12, 2015.

Simple Agreement for Future Equity (SAFE) documents for: Accelerate; Auren Hoffman; BevCob; Chang; Currys Paradox; David; Foundation Capital; Foundation Capital 2; Friedman FundersClub 64M LLC; Greenstein; Hale; Haystack Fund; Levance; Lunch Van; Mackey; Norwest Ventures; Pao; S2 Capital; Schachter; Scrum Ventures; Shasta Ventures; Songhurst Sterngold; Trefren; WeFunder; Weinstein; YCVC

Stock Purchase Agreements (SPA) for: Babineau; Chou; Larner; YC

YC Convertible Security, June 7, 2015

Y Combinator Application, March 26, 2015

**Databases**

S&P Capital IQ database

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**World Wide Web Sources**

American Society of Appraisers, *Business Valuation Standards, Glossary*.
http://www.appraisers.org/docs/default-source/discipline_bv/bv-standards.pdf?sfvrsn=0

Dezyre, *Data Science in Banking and Finance*.
https://www.dezyre.com/article/how-data-science-in-finance-has-increased-the-industrys-profitability/169

Michael S. Malone, "John Doerr's Startup Manual," *Fast Company*,
www.fastcompany.com/online/07/082doerr.html.

Second Measure website:  www.secondmeasure.com

International Data Corporation, *New IDC Forecast Sees Worldwide Big Data Technology and Services Market Growing to $48.6 Billion in 2019, Driven by Wide Adoption Across Industries*.
http://www.idc.com/getdoc.jsp?containerId=prUS40560115

MarketsandMarkets, *Financial Analytics Market worth $6.65 Billion by 2018*.
http://www.marketsandmarkets.com/PressReleases/financial-analytics.asp

PricewaterhouseCoopers, *FS Viewpoint*.
https://www.pwc.com/us/en/financial-services/publications/viewpoints/assets/pwc-unlocking-big-data-value.pdf

http://www.kauffman.org/uploadedFiles/kfs_2010_report.pdf .

Dezyre, *Data Science in Banking and Finance*.
https://www.dezyre.com/article/how-data-science-in-finance-has-increased-the-industrys-profitability/169

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**EXHIBITS**

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

# Valuation Summary

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

C O N F I D E N T I A L

# Valuation Summary

(as of 03/31/16)

| Methodology | Indicated Enterprise Value | Weighting [a] | Weighted Enterprise Value |
|---|---|---|---|
| Income Approach: Discounted Cash Flows | | | |
| Multi-period and Revenue Multiple | | | |
| Market Approach: Guideline Public Companies | | | |
| LTM Revenue | | | |
| LTM EBITDA | | | |
| NTM Revenue | | | |
| NTM EBITDA | | | |
| Market Approach: Guideline M&A Transactions [b] | | | |
| LTM Revenue | | | |
| LTM EBITDA | | | |
| **Indicated Enterprise Value** | | | |
| Add: Cash and Cash Equivalents | | | |
| Add: Non-operating Assets | | | |
| Less: Interest-bearing Debt [c] | | | |
| Less: Non-operating Liabilities | | | |
| **Equity Value of Minority Interests, as if Marketable** | | | |
| Less: Discount for Lack of Marketability [c] | | | |
| **Equity Value of Minority Interests, as if Non-Marketable** | | | |
| Shares of Common Stock [e] | | | |
| **Value of a 1% interest** | | | |



[a]  Weightings set based on professional judgment; see "Weighting of Valuation Approaches".
[b]  Market Approach: Guideline M&A Transactions previously adjusted for minority interest; see "Market Approach: Guideline M&A Transactions".
[c]  Includes Y Combinator Convertible Debt issued June 7, 2015, but excludes SAFEs
[d]  See "Selection of Discounts and Premiums".
[e]  Assumes the conversion of all SAFEs into shares of Common Stock based on the conversion terms of each SAFE.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**C O N F I D E N T I A L**

Exhibit 1

# Market Approach: Guideline Public Companies

C O N F I D E N T I A L

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

# Market Approach: Guideline Public Companies

($s in thousands, as of 03/31/16)

| Statistic | Company Data | Guideline Multiples | Indicated Enterprise Value (on a Minority, Marketable Basis) |
|---|---|---|---|
| LTM Revenue | | | |
| LTM EBITDA | | | |
| NTM Revenue | | | |
| NTM EBITDA | | | |

Source:  Capital IQ

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

C O N F I D E N T I A L       Exhibit 2

# Market Approach: Guideline Public Companies – Multiples

($s in millions, as of 03/31/16)

| Company | Ticker | TEV | Revenue | | EBITDA | | TEV / Rev | | TEV / EBITDA | |
|---------|--------|-----|---------|---------|--------|--------|-----------|-----------|--------------|-----------|
| | | | LTM | NTM | LTM | NTM | LTM | NTM | LTM | NTM |
| Fair Isaac Corporation | FICO | $ 3,854.5 | $ 848.9 | $ 897.8 | $ 197.8 | $ 216.9 | 4.5x | 4.3x | 19.5x | 17.8x |
| Morningstar Inc. | MORN | 3,636.1 | 791.1 | 822.4 | 254.3 | 261.0 | 4.6 | 4.4 | 14.3 | 13.9 |
| Asiakastieto Group Oyj | ATG1V | 301.5 | 51.4 | 52.2 | 24.5 | 24.4 | 5.9 | 5.8 | 12.3 | 12.4 |
| Value Line, Inc. | VALU | 141.7 | 34.4 | NA | 2.2 | NA | 4.1 | NM | NM | NM |

| | | | | |
|---|---|---|---|---|
| High | 5.9x | 5.8x | 19.5x | 17.8x |
| Top quartile | 4.9x | 5.1x | 16.9x | 15.9x |
| Mean | 4.8x | 4.8x | 15.4x | 14.7x |
| Median | 4.6x | 4.4x | 14.3x | 13.9x |
| Bottom quartile | 4.4x | 4.4x | 13.3x | 13.1x |
| Low | 4.1x | 4.3x | 12.3x | 12.4x |
| Coefficient of variation | 0.16 | 0.17 | 0.24 | 0.19 |

| | | | | |
|---|---|---|---|---|
| Selected Multiples | 3.5x | NM | NM | NM |

| | | | | |
|---|---|---|---|---|
| Second Measure (Valuation Date) | ████████ | | | |

Source: Capital IQ

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Exhibit 3

# Market Approach: Guideline Public Companies – Enterprise Values

($s in millions, except per share values; as of 03/31/16)

| Company | Ticker | Exchange | Stock Price Per Share | | | Market Cap | Avg. Daily Volume | Cash & Equiv. | Total Debt | TEV |
|---------|--------|----------|------|------|------|------|------|------|------|------|
| | | | 3/31/16 | 52 wk-hi | 52 wk-low | | | | | |
| Fair Isaac Corporation | FICO | NYSE | $ 106.07 | $ 106.64 | $ 77.57 | $ 3,328.9 | 0.1993 | $ 85.4 | $ 611.0 | $ 3,854.5 |
| Morningstar Inc. | MORN | NasdaqGS | 88.05 | 88.66 | 71.89 | 3,787.8 | 0.0822 | 226.7 | 75.0 | 3,636.1 |
| Asiakastieto Group Oyj | ATG1V | HLSE | 15.74 | 17.85 | 14.98 | 254.4 | 0.0932 | 32.1 | 79.2 | 301.5 |
| Value Line, Inc. | VALU | NasdaqCM | 15.86 | 19.72 | 9.93 | 156.6 | 0.0025 | 14.9 | - | 141.7 |

**Second Measure (Valuation Date)** ███████████████████████████████████████

Source: Capital IQ

CONFIDENTIAL

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Exhibit 4

# Market Approach: Guideline Public Companies – Operating Metrics

($s in millions, as of 03/31/16)

| Company | Ticker | LTM Operating Results | | | | LTM Margins | | | Revenue Growth | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Revenue | Gross Profit | EBITDA | EBIT | Gross | EBITDA | EBIT | 1-year | 3-year | 5-year |
| Fair Isaac Corporation | FICO | $ 848.9 | $ 591.1 | $ 197.8 | $ 165.8 | 69.6% | 23.3% | 19.5% | 4.0% | 5.8% | 6.5% |
| Morningstar Inc. | MORN | 791.1 | 454.4 | 254.3 | 188.4 | 57.4 | 32.1 | 23.8 | 2.9 | 5.9 | 6.4 |
| Asiakastieto Group Oyj | ATG1V | 51.4 | 31.7 | 24.5 | 23.6 | 61.6 | 47.7 | 45.9 | 8.7 | NA | NA |
| Value Line, Inc. | VALU | 34.4 | 26.5 | 2.2 | 1.9 | 77.2 | 6.4 | 5.6 | (5.2) | (1.3) | (8.3) |
| Mean | | | | | | 66.5% | 27.4% | 23.7% | 2.6% | 3.5% | 1.6% |
| Median | | | | | | 65.6% | 27.7% | 21.7% | 3.5% | 5.8% | 6.4% |

**Second Measure (Valuation Date)** ████████████████████████████████████

Source:  Capital IQ

**HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY**
Exhibit 5

# Market Approach: Guideline Public Companies – Balance Sheet Metrics

($s in millions, as of 03/31/16)

| Company | Ticker | Total Assets | ROA | ROE | Current Ratio | Quick Ratio | Inventory Days | A/R Days | A/P Days | Working Capital / Revenue | Net Working Capital / Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Isaac Corporation | FICO | $ 1,214.9 | 8.5% | 23.7% | 1.1x | 1.0x | NA | 70.1 | 41.9 | 4.2% | 5.3% |
| Morningstar Inc. | MORN | 1,032.7 | 11.4 | 20.4 | 1.2 | 1.2 | NA | 67.2 | 41.9 | 9.7 | (9.5) |
| Asiakastieto Group Oyj | ATG1V | 185.5 | 8.4 | 18.5 | 3.2 | 3.2 | NA | 63.6 | 121.8 | 55.4 | (7.0) |
| Value Line, Inc. | VALU | 85.7 | 1.4 | 20.4 | 0.7 | 0.7 | NA | 14.0 | 96.8 | (18.3) | (61.6) |
| Mean | | | 7.4% | 20.7% | 1.6x | 1.5x | NA | 53.7 | 75.6 | 12.7% | (18.2%) |
| Median | | | 8.4% | 20.4% | 1.2x | 1.1x | NA | 65.4 | 69.3 | 6.9% | (8.3%) |

Second Measure (Valuation Date)

Source:  Capital IQ

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Exhibit 6

C O N F I D E N T I A L

# Guideline Public Company Descriptions

## Fair Isaac Corporation (FICO)

Fair Isaac Corporation develops analytic, software, and data management solutions that enable businesses to automate, enhance, and connect decisions to business performance. The company offers analytical solutions, credit scoring, and credit account management solutions and services to banks, credit reporting agencies, credit card processing agencies, insurers, retailers, healthcare organizations, and public agencies. It operates through three segments: Applications, Scores, and Tools. The Applications segment offers pre-configured decision management applications designed for a specific type of business problem or process, such as marketing, account origination, customer management, fraud, collections, and insurance claims management, as well as associated professional services.



## Morningstar Inc. (MORN)

Morningstar, Inc. provides independent investment research services in North America, Europe, Australia, and Asia. The company provides data on approximately 500,000 investment offerings, including stocks, mutual funds, and similar vehicles; and global market data on approximately 17 million exchange-traded equities, derivatives, commodities, currencies, and other investments. It offers Morningstar Data, an investment data spanning various investment databases, including pricing and commodity data; Morningstar Advisor Workstation, a Web-based investment planning system; Morningstar Direct, an institutional investment research platform; and Morningstar.com, a Website for individual investors.



## Asiakastieto Group Oyj (ATG1V)

Asiakastieto Group Oyj, through its subsidiary, Suomen Asiakastieto Oy, provides business and consumer information services in Finland. The company offers credit and risk management services, including classifications, such as risk indicator, creditworthiness and financial reports, The Strongest in Finland certificate, and payment Indicator services; and company facts and credit information comprising basic and credit information, corporate leaders, financial statements and statement reports, activity data, and trade register documents.



HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Exhibit 7

# Guideline Public Company Descriptions (continued)

### Value Line, Inc. (VALU)

Value Line, Inc. produces and sells investment related periodical publications primarily in the United States. The company's investment periodicals and related publications cover various areas of investments, including stocks, mutual funds, exchange traded funds (ETFs), options, and convertible securities. It offers comprehensive research services, including The Value Line Investment Survey, The Value Line Investment Survey-Small and Mid-Cap, The Value Line 600, and The Value Line Fund Advisor Plus, which provide statistical and text coverage of various investment securities, with an emphasis placed on its proprietary research, analysis, and statistical ranks; and niche periodical newsletters, which include Value Line Select, Value Line Select: Dividend Income & Growth, and The Value Line Special Situations Service that provide information on a less comprehensive basis for securities that interest subscribers.



**Value Line, Inc. (VALU)**

Close: 15.86
52 Week High: 19.72
52 Week Low: 9.93

**HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY**
**Exhibit 8**

# Market Approach: Guideline M&A Transactions

C O N F I D E N T I A L

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

# Capital IQ Guideline M&A Transactions - Transactions

($s in millions, as of 03/31/16)

| Acquirer | Target | Target Description | Date Announced | Implied EV [a] | Target Financials LTM Rev | Target Financials LTM EBITDA | Transaction Multiple EV / LTM Rev | Transaction Multiple EV / LTM EBITDA |
|---|---|---|---|---|---|---|---|---|
| UBM plc | Advanstar Communications Inc. | Advanstar Communications Inc. provides event and marketing services for business professionals and consumers in fashion, licensing, life sciences, and power-sports industries. The company owns and operates a portfolio of trade shows, conferences, publications, electronic products, and Web sites. It provides fashion events; business events, media solutions, and motorcycle shows for original equipment and aftermarket manufacturers, exhibitors, distributors, service and repair professionals, dealers, and consumers; news coverage, in-depth business analysis, research, and training solutions; and operates an automotive professional online community. | 10/1/2014 | $972.0 | $291.0 | $83.0 | 3.3x | 11.7x |
| Symphony Technology Group | Dodge Data & Analytics, Inc. | Dodge Data & Analytics, Inc. provides data, analytics, news, and intelligence solutions to the construction industry in North America. It offers Dodge BidPro, which delivers a bidding alert dashboard that lets clients access customized construction projects; Dodge Global Network that enables clients to prioritize sales pipeline, increase construction bid win/loss ratio, and target the right relationships; and Dodge DocuPro, a construction document management solution that enables clients to take control of project and organization information. | 9/22/2014 | $320.0 | $170.0 | NA | 1.9x | NA |
| Simulations Plus, Inc. | Cognigen Corporation | Cognigen Corporation provides data analysis and consulting services for the pharmaceutical, biotechnology, and healthcare industries. Its services include modeling and simulation, development strategies, PK/PD support, workshops, and publications. Cognigen Corporation provides data analysis and consulting services for the pharmaceutical, biotechnology, and healthcare industries. Its services include modeling and simulation, development strategies, PK/PD support, workshops, and publications. | 7/23/2014 | $5.8 | $4.8 | $0.5 | 1.2x | 11.3x |
| Sysorex Global Holdings Corp. (nka:Sysorex Global) | Shoom, Inc. | Shoom, Inc. provides cloud-based data analytics and enterprise solutions to the media, publishing, and entertainment industries in the United States. The company offers eTearSheets, an electronic tearsheet solution that provides proof-of- publication products and services; eInvoice, an invoicing solution that combines eTearsheets service to provide publishers and advertisers with an organized billing and verification service | 8/31/2013 | $6.1 | $4.0 | $1.1 | 1.5x | 5.3x |
| CRISIL Limited | Coalition Development Ltd | Coalition Development Ltd provides business intelligence solutions. It offers products and services such as competitor analytics, including performance benchmarking and organizational insights; client analytics, that comprise institutional and corporate client wallets; country analytics, including country revenue pools, country-level competitor performance, and country-level client wallets; and competitor RWA analytics that comprise model, risk, and productivity assessment. | 6/1/2012 | $44.5 | $12.3 | NA | 3.6x | NA |

| | EV / LTM Rev | EV / LTM EBITDA |
|---|---|---|
| High | 3.6x | NA |
| Top quartile | 3.3x | NA |
| Mean | 2.3x | NA |
| Median | 1.9x | NA |
| Bottom quartile | 1.5x | NA |
| Low | 1.2x | NA |
| Coefficient of variation | 0.47 | NA |

Source: Capital IQ, SEC Filings
[a] Enterprise Value (EV) = Total Consideration - Cash and Equivalents + Long-Term Debt

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**C O N F I D E N T I A L**

**Exhibit 9**

# Financial Statements

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

C O N F I D E N T I A L

## Summary Income Statement

($s in thousands)

Fiscal year ends December 31

| | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|---|---|



Total revenue
  *% growth*

Cost of goods sold
  *% of revenue*

Gross profit
  *Gross margin (%)*

Operating expenses

Operating income
  *Operating margin (%)*

  Interest income (expense)
  Other income (expense)
Pre-tax income

Tax expense
  *Tax rate (%)*

Net income
  *Net margin (%)*

EBIT

[a] Second Measure Quarterly P&L Jan 2015 to Mar 2016.xslx

C O N F I D E N T I A L

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
**Exhibit 10**

# Relative Income Statement

($s in thousands)

| Fiscal year ends December 31 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|---|---|
| Total revenue | | | | | |
| Cost of goods sold | | | | | |
| Gross profit | | | | | |
| Operating expenses | | | | | |
| Operating income | | | | | |
| Interest income (expense) | | | | | |
| Other income (expense) | | | | | |
| Pre-tax income | | | | | |
| Tax expense | | | | | |
| Net income | | | | | |
| EBIT | | | | | |

[a]  Second Measure Quarterly P&L Jan 2015 to Mar 2016.xslx

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

**Exhibit 11**

# Comparative Summary Balance Sheet

($s in thousands)

| Balance Sheet - Fiscal Year End December 31 | 2015 | March 31, 2016 |
|---|---|---|
| **Assets** | | |
| Cash and marketable securities | | |
| Accounts receivable | | |
| Inventory | | |
| Prepaid expenses and deposits | | |
| Other current assets | | |
| **Current assets** | | |
| Property, plant, and equipment | | |
| Other long term assets | | |
| **Total assets** | | |
| **Liabilities** | | |
| Short term debt | | |
| Accounts payable | | |
| Accrued liabilities | | |
| Deferred revenue | | |
| Other current liabilities | | |
| **Current liabilities** | | |
| Long term debt (non-current) | | |
| Other long term liabilities | | |
| Minority interest | | |
| **Total liabilities** | | |
| **Total stockholders' equity** | | |
| **Total liabilities and stockholders' equity** | | |

| Relative Balance Sheet | 2015 | March 31, 2016 |
|---|---|---|
| **Assets** | | |
| Cash and marketable securities | | |
| Accounts receivable | | |
| Inventory | | |
| Prepaid expenses and deposits | | |
| Other current assets | | |
| **Current assets** | | |
| Property, plant, and equipment | | |
| Other long term assets | | |
| **Total assets** | | |
| **Liabilities** | | |
| Short term debt | | |
| Accounts payable | | |
| Accrued liabilities | | |
| Deferred revenue | | |
| Other current liabilities | | |
| **Current liabilities** | | |
| Long term debt (non-current) | | |
| Other long term liabilities | | |
| Minority interest | | |
| **Total liabilities** | | |
| **Total stockholders' equity** | | |
| **Total liabilities and stockholders' equity** | | |

[a] balance-sheet-from-01-01-2015-to-03-31-2016_quarterly.pdf

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
**Exhibit 12**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# Exhibit 2

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Second Measure, Inc. v. Steven Kim

United States District Court
Northern District of California
Case No. 3:15-cv-03395

Expert Witness Rebuttal Report

Mark Newton, CPA, ABV, CFF

July 29, 2016

Oakland, California

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

# Table of Contents

| | |
|---|---|
| Scope of Engagement | 3 |
| Qualifications | 3 |
| Use and Distribution of this Report | 3 |
| Opinions of Economic Loss | 3 |
| Background | 3 |
| Implications of Y Combinator Relationship | 5 |
| Value as of September 2014 | 5 |
| Critique of Timmins Report | 6 |
| Documents Provided Or Used | 7 |
| Additional Work | 7 |
| Compensation | 7 |
| List of Documents in Support of Opinions | Exhibit 1 |
| Curriculum Vitae of Mark Newton | Exhibit 2 |
| Testimony in Last Four Years | Exhibit 3 |

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

**Scope of Engagement**

I have been engaged by Thomas V. Christopher, counsel for defendant Steven Kim to rebut the expert report of Jim Timmins, ASA, dated July 1, 2016.

**Qualifications**

I am a Certified Public Accountant, licensed in the States of Washington and California.  I have been retained to assess economic damages on many hundreds of cases during my career over 30 years.  I regularly present seminars to various companies and claims associations pertaining to loss of income and other forensic accounting and economic topics.  Additionally, I have testified as an expert in over 100 cases in various venues.

I am a shareholder of Hagen, Streiff, Newton & Oshiro, Accountants, P.C.  My curriculum vitae are attached as Exhibit 2 to this report and my list of testimonies is included as Exhibit 3.

**Use and Distribution of this Report**

This report is limited to this litigation, the attorneys, experts, and the court under the terms of the applicable protective order.

**Opinions of Economic Loss**

I have been retained to rebut the expert witness report of Jim Timmins ASA. I have read and analyzed documents that were provided to me in order to form my opinions.  I have employed standard economic and valuation methodologies used in the field to prepare my opinions in this case.

Mr. Timmins has opined that Second Measure/ Project Recon [the Company] had no value in September 2014. I disagree with his conclusion and his reasoning.

**Background**

In the summer of 2013, Mr. Kim was working with credit card data supplied by ████. ████ is a service of ████████████, which advertises itself as ████████████████████████████████████████████████████████████████████████████████████████████████████████████ Mr. Kim was using the data to analyze investments in his role as a hedge fund investor. He had two terabytes of data, and needed a way to organize it into a form that would be useful for investment decisions. He contacted Mr. Babineau[2], who was a senior software engineer at Rumble, a video game company.  Mssrs. Babineau and Kim worked on the project together for the next year and a half. During that time, the hedge fund Mr. Kim worked for folded, and he devoted full time to working on the project. Mr. Babineau left Rumble and worked at The Factory, a "labs style product incubator" in San Francisco.

---

[2] https://www.linkedin.com/in/mbabineau

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

Lillian Chou, Mr. Babineau's girlfriend, was a manager at Rumble[3], and was invited by Mr. Babineau to work on the project. In September of 2014, Mr. Kim did not want Ms. Chou as a partner in the enterprise, and asked Mr. Babineau to clarify what he considered her role to be. This precipitated a rupture between Babineau and Kim, and Kim found himself locked out of the software. However, Kim and Babineau were still communicating about the project: Mr. Babineau asked Mr. Kim for his advice about contract negotiations between the Company and ███ .

In January of 2015, The Factory closed, and Mr. Babineau became a part time consultant for Mesosphere at the same time as he continued to develop the Company. The Company was incorporated as Second Measure in the state of Delaware on January 14, 2015. In May 2015, Mr. Babineau stopped work at Mesosphere and worked full time at the Company, which had been accepted into Y Combinator's incubator program.

Y Combinator is an incubator located in Silicon Valley[4]. It is highly sought after as a place for startups due to its wealth of connections with funding sources and valuable consulting advice. According to its website, Y Combinator has two programs per year, one starting in January and one starting in June of each year. The application deadlines for the programs are in mid-March and mid-October, respectively. Applicants are generally accepted a month following the deadline. Acceptance into the program means that the firm will be funded by Y Combinator for $120,000, which will take 7% of the equity. At the end of the program, the startups will get a chance to pitch venture capitalists in "Demo Day"; given the track record of prior Y Combinator companies, as well as Y Combinator's advice for the presentation, this typically results in an investment by one or more venture capitalists. The investment in this Series A round is generally an investment called a "SAFE", which stands for Simple Agreement for Future Equity. The SAFE is not debt, but will be converted into equity when there is another round of financing or a liquidity event.[5]

The Company successfully passed demo day and received approximately $2,000,000 in funding by a number of venture capitalists, including Bessemer Venture Partners, Norwest Venture Partners, and Shasta Ventures.[6] Y Combinator itself was also an investor at this round. According to Mr. Kim, an investment of that size typically means a valuation of approximately $10,000,000[7]. We have been provided five documents[8] from Y Combinator showing SAFE investments in the Company, four dated 8/18/15 and one dated 9/6/15. The names of the investors have been redacted. However, the "Val Cap" is noted on each one; the 8/18 SAFEs show a valuation cap of $8,000,000 and the 9/6 SAFE shows a valuation cap of $12,000,000.

**Implications of Y Combinator Relationship**

As of the acceptance date into Y Combinator, under the standard deal on Y Combinator's web site, 7% of the equity of an accepted company is valued at $120,000. This implies a valuation of $120,000 / .07 = $1,714,286. Please note that we do not have the documentation of the agreement between the Company and Y Combinator; however, these are the terms currently offered on Y Combinator's web site.

As noted, Business Insider reported that several of the top venture capitalists had invested approximately $2,000,000 as of a post in Business Insider dated April 5th, 2016. The announcement does not say the percentage of the company this represented. However, it was likely a non-controlling share, and certainly a non-marketable interest, in the sense that it was not marketable like the shares of a publicly traded stock.

[3] https://www.linkedin.com/in/lillianychou
[4] Please see the Y Combinator web site at https://www.ycombinator.com/about/
[5] https://www.ycombinator.com/documents/
[6] http://www.businessinsider.com/second-measure-is-secret-weapon-for-investors-to-outsmart-each-other-2016-4
[7] Interview with Steve Kim.
[8] SMI00018821 - 18855

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

Mr. Timmins has opined the Company was worth $███████ on March 31, 2016 on a non-marketable, control basis, and $███████ on a non-marketable minority basis[9]. This is likely lower than the fair market value at that time given that $2,000,000 had been invested not long before that probably on a non-controlling basis and certainly on a non-marketable basis.

**Value as of September 2014**

According to Mr. Kim[10], the software was almost ready for presentation to investors and potential users of the software at the time he was shut out of the company. The work that had to be done between September 2014 and the acceptance into Y Combinator included:

- Cosmetic enhancement of the tool such as changing the color and look of the dashboard.
- Improvements to allow a user to save proprietary file searches and analyses from sessions to session.
- Conclude the negotiations with ███████.
- Incorporation of the Company.
- Development of presentation materials – i.e., a "pitch deck" that would have been prepared for the application to Y Combinator.

Other than obtaining an agreement with ███████, the remaining aspects to complete the product to be ready to pitch to Y Combinator or other parties were relatively minor in terms of time required, according to my conversations with Mr. Kim.

The importance of concluding an agreement with ███████ cannot be underestimated as the Company could not operate without access to ███████'s data. But, according to Mr. Kim, ███████ was aware of their intentions, as they had been keeping ███████ updated while they worked on their product. While the final terms had not been set, it is Mr. Kim's opinion that the fact of a deal with ███████ was not in doubt. As previously mentioned, Mr. Babineau sought Mr. Kim's advice in finalizing an agreement with ███████ even after the split between the two men occurred. And, as we now know, the Company did reach an agreement with ███████. Mr. Kim has indicated to me that he estimates the tool was 95% complete as of September 2014.

Thus, it is my opinion that the value of the Company in September 2014 was approximately 90% to 95% of the implied value using the Y Combinator transaction. This means I estimate the value of the Company in September 2014 at a range of $1,540,000 to $1,630,000.

**Critique of Timmins Report**

As noted above, Mr. Timmins has opined that the value of Second Measure was $███████ on a control basis on March 31, 2016. While we are not disputing the general range of value, we note that he did not follow accepted valuation practice in that he ignored prior transactions in the stock. Please see Revenue Ruling 59-60[11] which states:

---

[9] Timmins report pages 21 and 22.
[10] Interview with Steven Kim
[11] Treasury Revenue Ruling 59-60, 1959-1 CB 237 (Jan. 1, 1959). Note that the CCH *Business Valuation Sourcebook* calls Revenue Ruling 59-60 "The Bible of Appraisal".

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

Sec. 4. Factors to Consider
…
(g) Sales of the stock… Sales of stock of a closely held corporation should be carefully investigated to determine whether they represent transactions at arm's length…

And Shannon Pratt's "Valuing a Business"[12], which states:

> To the extent that past transactions in the stock were at arm's length, they provide objective evidence of value. Even if not accepted, a bona fide offer, particularly if submitted in writing, can at lease corroborate the value… The transaction record usually should go as far back as the number of years of financial statements used.

Similarly, the CCH *Business Valuation Guide* elaborates[13]:

> §817 Past and Future Transactions in the Shares
> The market valuation approach explains how past transactions in the shares of a company can sometimes serve as valid indicators of the fair market value of the shares… the analyst should enquire as to what gave rise to the transaction and whether or not management believes it indicates current value, and why or why not… Valuators frequently fail to ask management if the company is currently considering a possible sale of the company, if it has recently received offers for its purchase or if it is in negotiation with a prospective buyer… the knowledge that there are discussions underway with a buyer can be highly relevant.

Mr. Timmins has also declared that there was no value to the Company in September 2014. He does not discuss the investment by Y Combinator when it was accepted into the incubator program or the investments by venture capitalists when it graduated from the program. He does not discuss the fact that the Company was deemed to have management, a potential market, and a product worthy of inclusion in Y Combinator's program.

Standard practice in valuation is that information from after the date of valuation may be used when it was reasonably foreseeable, relevant, or probative of value[14]:

> Events subsequent to the valuation date should not be taken into consideration when valuing business interests, unless at least one of these five conditions is true:
>
> 1. The subsequent events were reasonably foreseeable as of the valuation date.
> 2. The subsequent events are relevant to the valuation, and appropriate adjustments are made to account for the differences between the valuation date and the date of such subsequent events.
> 3. The subsequent events are not used to arrive at the valuation, but to confirm the valuation already concluded.
> 4. The subsequent events relate to property that is comparable to the property being valued, and the subsequent events are probative of value.

---

[12] *Valuing A Business, The Analysis and Appraisal of Closely Held Companies, Fourth Edition,* Shannon Pratt, Robert Reilly, and Robert Schweihs. P. 70.
[13] *CCH Business Valuation Guide,* George Hawkins and Michael Paschall, 2013 update
[14] *Business Valuation and Taxes, Procedure, Law, and Perspective* David Laro, JD and Shannon Pratt, ASA, 2005, p. 23. Please note that Mr. Laro is senior judge on the US Tax Court.

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

5.  Subsequent events may be evidence of value rather than as something that affects value.

Furthermore, the Supreme Court has stated in a patent case that is surely relevant to this issue[15]:

> … at times the only evidence available may be that supplied by testimony of experts… This will generally be the case if the trial follows quickly after the issue of the patent. But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.

In September 2014, it was reasonably foreseeable that the company would incorporate, negotiate an agreement with ████ and move toward sales of its services. The investment by Y Combinator is certainly relevant, as called for in the first condition. Had we knowledge of the costs of incorporation and engineering and management time expended in the September 2014 to March 2015 period, we would make appropriate adjustments as called for in the second condition. The time elapsed from the lock out in September to the application to Y Combinator was approximately six months. It does not seem reasonable that the value was created solely in that period.

Finally, Mr. Timmins apparently thinks that a startup company is valueless if an angel or venture capitalist would not invest in it, and opines that such an investor would not have been interested in the Company in September 2014. Yet the same survey he cites shows that 98% of startups are funded without such investors. Does Mr. Timmins truly believe that 98% of all startups are valueless, simply because they are self-funded or funded by non-institutional investors? That does not make sense.

**Documents Provided or Used**

A listing of the documents I have received in this case and that I have relied upon to determine my opinions is provided in Exhibit 1 of this report and the footnotes of the accompanying schedules.

**Additional Work**

As in many cases, I expect that I may receive additional information as discovery continues. I may be asked to analyze such information and to provide or amend my opinions as required. Also, I expect to prepare for deposition and trial and to testify as requested.

**Compensation**

I am being compensated for my work at a rate of $425 per hour.  My hourly rate for testimony is $495.

Mark R. Newton, CPA | ABV | CFF

---

[15] *Sinclair Refining Co. v. Jenkins Petroleum Process Co.* 289 US 689 (53 S. Ct. 736, 77 L. Ed. 1449) Justice Cardozo wrote the opinion.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

# Exhibit 1

## List of Documents Reviewed

I.    Financial Statements for Second Measure
    a.  Balance sheet dated 3/31/16
    b.  Profit and loss statement for January 2015 – March 2016
II.   Responses to Interrogatories
    a.  Counterclaimant and Counterclaim Defendant Lillian Chou's Supplemental Responses and Objections to Defendant and Counterclaimant Steven Kim's First Set of Interrogatories dated 4/1/16
    b.  Plaintiff and Counterclaim Defendant Second Measure Inc.'s Supplemental Responses and Objections to Defendant and Counterclaimant Steven Kim's First Set of Interrogatories dated 4/1/16
    c.  Confidential Amended Responses and Objections of Defendant Steven Kim to Plaintiff Second Measure, Inc.'s First Set of Interrogatories
III.  Documents relating to SAFE investments in Second Measure, Inc. : SMI00018821 – 18855
IV.   Expert Report of Jim Timmins dated 7/1/16

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

Exhibit 2

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

---

## Mark R. Newton, CPA/ABV, CFF

## Partner

1330 Broadway #430

Oakland, CA 94612

Office: (510) 740-0387

Cell:    (415) 279-1859

Email:  mnewton@hsno.com

### PROFESSIONAL EXPERIENCE
**Hagen, Streiff, Newton & Oshiro, Accountants, P.C**.
Mr. Newton, Managing Partner of HSNO, established the firm's Northern California practice in 1977 in San Francisco and the Seattle office in 2005.  He specializes in the measurement of Economic Damages, Business Valuation and Forensic Accounting. His experience has involved almost every industry and includes damage measurement resulting from business interruption, construction defect, business valuation cases, contract disputes, intellectual property infringement, class action, property loss, consequential losses, fraud, product liability, wage and hour cases, employee pay disputes and personal injury.  Mr. Newton has significant experience in the measurement of construction claims and consequential damages for both owners and contractors.  His many fraud assignments have involved embezzlement, construction claims, theft of cash, theft of inventory and other personal property, kickback schemes, and employee dishonesty.  Additionally, Mr. Newton has investigated a variety of cases involving alter ego status.

### EXPERT TESTIMONY
Mr. Newton has testified as an expert witness on many occasions in State Court, Federal Court, arbitrations and insurance appraisals. He has also testified before the International Trade Commission in Washington, DC regarding patent infringement.

### ALTERNATIVE DISPUTE RESOLUTION
Mr. Newton has been appointed on several occasions to act as a neutral expert or to provide an independent accounting for multiple parties involved in a dispute.

### EDUCATION
- BA, Economics, University of California at Los Angeles
- Continuing Professional Education requirements fulfilled as required by the AICPA and the Washington and California State Boards of Accountancy.

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

**LICENSES**
Certified Public Accountant
- Washington      2008      # 26759
- California      1979      # 27261

**PROFESSIONAL ACCREDITATIONS**
- ABV - Accredited in Business Valuations – AICPA
- CFF – Certified in Financial Forensics - AICPA

**PROFESSIONAL ASSOCIATIONS**
- American Institute of Certified Public Accountants
- National Association of Forensic Economists
- Washington Society of Certified Public Accountants
- California Society of Certified Public Accountants
- Puget Sound Adjusters Association (PSAA)
- Property Claims Association of the Pacific
- Loss Executives Association

**RECENT PRESENTED SEMINARS**

| | | |
|---|---|---|
| *Econonuggets – Personal Injury* | WDTL Seattle | April 27, 2016 |
| *Wind Energy Losses* | PLRB Anaheim | April 1, 2015 |
| *Valuing Household Services in Asbestos Litigation* | *ADC San Francisco* | *May 27, 2014* |
| *Expanding Business Income Loss Coverage Impact of Amerigraphics* | *PLRB Jacksonville* | *November 19, 2013* |
| *Wind Energy Losses in the Sky* | PLRB Orlando | April 16, 2012 |
| *Wind Energy Losses* | PLRB Nashville | April 5, 2011 |
| *Renewable Energy Losses* | PLRB San Antonio | March 22/24, 2010 |
| *Renewable Energy Losses* | PLRB Seattle | March 23/25, 2009 |
| *Preventing Pain – Punitive Damages* | ADC San Francisco | December 4, 2008 |
| *Renewable Energy Losses* | PLRB Boston | April 15/16, 2008 |
| *Forensic Accounting in Construction Litigation* | Washington Society of CPAs Bellevue | October 30, 2006 |
| *Extended Period Business Income Loss* | CCNC Sacramento | Sept.  21, 2006 |
| *Economic Damages From Construction Defects* | ADC San Francisco | Sept. 16, 2005 |
| *Independent Power Producer Losses* | PLRB Scottsdale | November 30, 2004 |
| *Power Generation Losses* | Lloyd's of London | July 6, 2004 |
| *Contingent Business Interruption* | PLRB Chicago | March 15/17, 2004 |
| *Contingent Business Interruption* | PLRB Orlando | March 30, 2003 |

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

Exhibit 3



Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

## RECENT EXPERT TESTIMONY - GENERAL LITIGATION

**MARK R. NEWTON**
**RECENT EXPERT TESTIMONY - GENERAL LITIGATION**

| Case | Type | Venue | Case # | Date |
|---|---|---|---|---|
| Robert Harmon vs. C. Michael Hughes, et al | Trial | King County Superior | 15-2-00152-3 KNT | July 21, 2016 |
| Parker Place Group, LLC vs. Shasta Crossroads II, LLC (Wingmen V LLC as Cross Defendant/Complainant) | Deposition | Shasta County Superior | 183157 | July 7, 2016 |
| ABM Parking Services, Inc. vs. Seattle Second and James LLC | Trial | King County Superior | 15-2-04105-3 | June 21, 2016 |
| Helsper, et al vs. Kyriakou | Arbitration | King County Superior | 13-2-030108-5 | June 23, 2016 |
| Stevens vs. Jiffy Lube International | Arbitration | AAA | 10-15-0005-2190 | June 15, 2016 |
| Cilker Apartments, LLC vs. Western National Construction, et al | Deposition | Santa Clara County Superior | 113CV258281 | June 13, 2016 |
| ABM Parking Services, Inc. vs. Seattle Second and James LLC | Deposition | King County Superior | 15-2-04105-3 | June 9, 2016 |
| Cuccia vs. Purcell | Trial | Marin County Superior | CIV1201675 | May 27, 2016 |
| Stevens vs. Jiffy Lube International | Deposition | AAA | 10-15-0005-2190 | May 13, 2016 |
| Cuccia vs. Purcell | Trial | Marin County Superior | CIV1201675 | May 2, 2016 |
| Armada Acquisitions Group, LLC vs. Wing | Arbitration | AAA | 01-14-0002-1948 | February 5, 2016 |
| Armada Acquisitions Group, LLC vs. Wing | Arbitration | AAA | 01-14-0002-1948 | February 3, 2016 |
| State of Colorado vs. Alan DeAtley | Trial | | | February 2, 2016 |
| JKL Construction, Inc. vs. URS Corporation | Arbitration | | | November 16, 2015 |
| Gardner vs. San Francisco Lesbian, Gay, Bisexual, Transgender Pride Celebration Committee, Inc. | Deposition | | | October 22, 2015 |
| Truck Insurance Exchange vs. Champion Steam Cleaning | Depostion | | | October 5, 2015 |
| DiGiorgio, et al v. Chila | Trial | | | September 29, 2015 |
| DiGiorgio, et al v. Chila | Deposition | | | September 28, 2015 |
| Gotcher v. Inter-City Contractors, Inc. | Deposition | | | September 10, 2015 |
| Mutual of Eunemclaw v. Gregg Roofing, Inc. | Deposition | | | August 4, 2015 |
| Abiad, Yabut, et al v. Limalima, et al | Arbitration | | | July 21, 2015 |
| Abiad, Yabut, et al v. Limalima, et al | Deposition | | | July 15, 2015 |
| Coyote Valley RV v. Cusack Construction, et al | Deposition | | | June 4, 2015 |
| Ingenco Holdings, et al v. ACE American Insurance | Deposition | | | March 11, 2015 |
| Johnson v. Sutter Health, Sierra Region | Deposition | | | March 4, 2015 |
| North Natomas v. USA Properties | Deposition | | | January 12, 2015 |
| Maitri Compassionate Care v. AIDS Healthcare | Deposition | | | November 6, 2014 |
| Nicholson v. Thrifty Payless and Rite Aid | Deposition | | | October 14, 2014 |

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

| Chen v. City of Medina | Trial | August 15, 2014 |
| | | August 14, 2014 |
| Chen v. City of Medina | Deposition | July 31, 2014 |
| Hartnett v. Forensic Analytical Specialties | Trial | July 29, 2014 |
| Webcor - Andy Ball Matter | Testimony | July 28, 2014 |



## MARK R. NEWTON
### RECENT EXPERT TESTIMONY - GENERAL LITIGATION

| Case | Type | Venue | Case # | Date |
|------|------|-------|--------|------|
| Barnard Pipeline, Inc. v. Travelers Property & Casualty | Deposition | | | February 6, 2014 |
| Andrew Ball v. Wecbor, et al. | Deposition | | | February 4, 2014 |
| Devil's Canyon Brewery v. B.R. Liquids | Trial | | | October 28/29, 2013 |
| Sunlink v. Hypower | Arbitration | | | October 11, 2013 |
| Devil's Canyon Brewery v. BRJ Liquids | Deposition | | | October 10, 2013 |
| Capri Creek Associates v. Etter & Sons | Deposition | | | September 10, 2013 |
| Sunlink Corporation v. Hypower, Inc. | Arbitration | | | July 17, 2013 |
| SunLink Corporation v. Hypower, Inc. | Deposition | | | July 9, 2013 |
| Sandoval v. Eagle Pizzeria, et al. | Deposition | | | June 14, 2013 |
| AerofilterFDC, LP | Arbitration | | | June 13, 2013 |
| All Continents Travel, et al. v. Travel Viva | Trial | | | May 22-23, 2013 |
| Ennen v. Integon Indemnity | Trial | | | May 2, 2013 |
| Jeff DeSalvo v. Mike Syben | Deposition | | | April 10, 2013 |
| BRJ & Associates v. Kitchell CEM, Inc. | Arbitration | | | March 29, 2013 |
| San Mateo West v. Douglas Ross Construction | Deposition | | | February 28, 2013 |
| Sellen Construction 2 - FH, LLC. | Deposition | | | February 26, 2013 |
| Moment v. 3130 Pacific LLC | Arbitration | | | December 6, 2012 |
| Columbia Industries, Inc. vs. Zurich American Insurance Co. | Deposition | | | October 18, 2012 |
| Caruso's LLC dba Fish v. Alexander Enterprises | Deposition | | | October 5, 2012 |
| Slarve v. Coufal | Trial<br>Deposition | | | September 17, 2012<br>August 16, 2012 |
| Webcor Construction v. Wilshire Landmark, et al. | Deposition | | | September 11, 2012 |
| Gul, et al. v. Garda CL West, et al. | Deposition | | | September 7, 2012 |
| Rowen v. Aerometals | Arbitration | | | August 29, 2012 |
| Asima Gul v. Garda Security | Deposition &<br>Deposition | | | August 21, 2012<br>August 15, 2012 |
| Beserra v. Griffin | Deposition | | | June 13, 2012 |
| 2880 Stevens Creek v. Blach Construction | Deposition | | | May 17, 2012 |
| East Baybridge Partners v. Catellus Residential Construction | Deposition | | | May 16, 2012 |
| Rudy v. Kaiser | Deposition | | | March 1, 2012 |
| Bero v. Westerdal | Deposition | | | January 13, 2012 |
| Scottsdale Insurance v. Ford Motor | Depositon | | | December 19, 2011 |
| Ingram v. Garda C.L. West, et al | Deposition<br>Trial | | | November 28, 2011<br>March 9, 2012 |
| Pacific Capital Investments v. Crystal Springs 200 | | | | |

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395



**MARK R. NEWTON**
**RECENT EXPERT TESTIMONY - GENERAL LITIGATION**

| Case | Type | Venue | Case # | Date |
|---|---|---|---|---|
| Apartments, Ltd, et al | Deposition | | | November 2, 2011 |
| San Clemente Housing Partners LP v Nordby Construction Co. et al | Deposition | | | October 21, 2011 |
| Gustin, Schreiner & Gustin v. Siu | Trial | | | October 7, 2011 |
| Becho, Inc. v. Shasta Constructors, Inc. | Arbitration | | | September 12, 2011 |
| | Arbitration | | | June 30, 2011 |
| HTI Holdings, Inc. v. Hartford Casualty Insurance Company | Deposition | | | July 27, 2011 |
| | Deposition | | | January 28, 2011 |
| U.S. Bank v. Lane | Trial | | | June 24, 2011 |
| Lewison v. Discover | Deposition | | | June 7, 2011 |
| Becho, Inc. v. Shasta Constructors, Inc. | Deposition | | | May 23, 2011 |

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395



**MARK R. NEWTON**
**RECENT EXPERT TESTIMONY - ASBESTOS**

| Case | Type | Venue | Case # | Date |
|------|------|-------|--------|------|
| Robert Lanthier vs. A.O. Reed & Company, et al | Deposition | San Diego Superior | 37-2015-00035357 | June 14, 2016 |
| Hill vs. Ameron International Corporation | Deposition | | | June 6, 2016 |
| Heath vs. 3 M Company, et al | Deposition | | | February 24, 2016 |
| Claudet Webber vs. Basco Drywall & Painting, Co., et al. | Deposition | | | February 10, 2016 |
| Wedvik vs. Lone Star Industries, et al | Deposition | | | October 17, 2015 |
| Gail Elizabeth Walashek, et al. vs. Air & Liquid Systems Corp., et al | Deposition | | | October 7, 2015 |
| Anna Grimsley v. 4520 Corporation, et al | Deposition | | | September 8, 2015 |
| Hubbard, Shirley v. Asbestos Defendants | Deposition | | | March 23, 2015 |
| Maia, Ernest v. Asbestos Defendants | Deposition | | | February 11, 2015 |
| Boyd, Gerald v. Asbestos Defendants | Deposition | | | February 3, 2015 |
| Tremblay, Christine v. Asbestos Defendants | Deposition | | | November 24, 2014 |
| Cantrell, Susan v. Asbestos Defendants | Deposition | | | September 11, 2014 |
| Thompson, John v. Asbestos Defendants | Deposition | | | September 2, 2014 |
| Stefanson, Richard v. Asbestos Defendants | Trial | | | |
| Peoples, Edna v. Asbestos Defendants | Deposition | | | August 5, 2014 |
| Stefanson, Richard v. Asbestos Defendants | Deposition | | | July 17, 2014 |
| Jim Rubino, et al v. Asbestos Defendants | Deposition | | | June 2, 2014 |
| Koepke, Harold and Nancy Karidis-Koepke vs. Ford Motor Company | Deposition | | | June 2, 2014 |
| McBride, Sharon v. Asbestos Defendants | Deposition | | | May 16, 2014 |
| Strouse, Susan v. Asbestos Defendants | Deposition | | | April 16, 2014 |
| Hindman, Michael Eugene v. Asbestos Defendants | Trial | | | April 17, 2014 |
| Hindman, Michael Eugene v. Asbestos Defendants | Deposition | | | April 11, 2014 |
| Moran, Richard III v. Asbestos Defendants | Deposition | | | April 3, 2014 |
| Rogers, Billy v. Asbestos Defendants | Deposition | | | December 9, 2013 |
| Morgan v. J.T. Thorpe & Sons, et al | Deposition | | | October 29, 2013 |
| Schildknegt v. Air & Liquid Systems Corp., et al | Deposition | | | October 14, 2013 |
| LeBoa v Alta Building Material Co., et al | Deposition | | | August 7, 2013 |
| McClain, Tommy & Gloria v. Asbestos Corporation | Deposition | | | July 26, 2013 |
| Ronald Nelson v. Big B Lumberteria | Deposition | | | July 16, 2013 |

Second Measure, Inc. v. Steven Kim
United States District Court
Northern District of California
Case No. 3:15-cv-03395

| | | |
|---|---|---|
| Jackson, Arvine v. Asbestos Defendants | Deposition | May 31, 2013 |
| Estenson v. Asbestos Defendants | Deposition | April 23, 2013 |
| Donald and Viola Willis v. Buffalo Pumps, Inc., et al. | Deposition | April 3, 2013 |
| Sellen Construction 2 - FH, LLC. | Deposition | February 26, 2013 |
| Moment v. 3130 Pacific LLC | Arbitration | December 6, 2012 |
| Mary Ellen Kelly v. Asbestos Defendants | Deposition | November 27, 2012 |
| Michael and Carol Corbett v. Agilent Technologies | Deposition | October 17, 2012 |
| Geradine Lepore v. AC& S Inc., et. Al | Deposition | October 12, 2012 |
| Lehman v. Allied, et all | Deposition | September 19, 2011 |
| Jazuk, James & Marjorie v. American Optical, et al | Deposition | September 1, 2011 |
| Floyd v. Liquid & Air Systems Corporation | Deposition | August 25, 2011 |
| Bruno v. Asbestos Defendants | Deposition | June 10, 2011 |
| Box v. Fluor, et al | Deposition | May 25, 2011 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# Exhibit 3

THE LAW OFFICES OF THOMAS V. CHRISTOPHER
THE BANK OF AMERICA CENTER
555 CALIFORNIA STREET, STE. 4925
SAN FRANCISCO, CA 94104
(t) 415-659-1805
(f) 415-659-1950
Email:  thomas@thomaschristopherlaw.com
Web: thomaschristopherlaw.com

March 2, 2016

**Via Electronic Mail**

Mr. Nitoj Singh
Dhillon Law Group
1700 Post Street, Suite 700
San Francisco, CA 94108

  Re: **Second Measure v. Kim**

**MEET AND CONFER CORRESPONDENCE**

Mr. Singh,

This letter is intended as a meet and confer regarding your clients' outstanding discovery obligations and is being provided pursuant to Judge Spero's November 18, 2014, Standing Order.  We request a written response to this letter or an in person meet and confer in the next 5 business days.

**30(b)(6) Deposition Objections**

As you know, during Second Measure's 30(b)(6) deposition on February 24, 2016, I asked him several questions regarding the financial results of Second Measure.  For example, I asked him to state Second Measure's profits for Q4 2015, Q3 2015, etc.  Each of these questions was proper in light of item number 5 of the deposition notice, which specifically identified as a deposition topic "The financial performance of Second Measure from its creation to date, including but not limited to its revenues, profits, cash flows, P & L's, costs of goods sold, sales results, sales projections, expenses, net profits, net income, actual or proposed budgets, etc., including but not limited to any future projections regarding Second Measure's financial performance."  Moreover, the deponent

confirmed during the deposition that he was the person most knowledgeable at Second Measure to testify regarding that subject matter.

In response to these questions, you instructed the deponent not to respond to the question on the basis of a "trade secrets" privilege.  We do not believe that any trade secret privilege is appropriate here.  For one, "there is no absolute privilege for trade secrets and similar confidential information." L.G. Philips LCD Co. Ltd. v. Tatung Co., 2007 WL 869700, at *2 (E.D. Cal., Mar. 21, 2007)(F-07-0009 EFB).  Moreover, financial results do not fall within the narrow scope of protectable trade secrets, which generally only include:

> [I]nformation, including a formula, pattern, compilation, program, devise, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Upjohn Co. v. Hygieia Biological Laboratories 151 F.R.D. 355, 358 (E.D. Cal. 1993). There is no question in our mind but that financial results do not constitute "information, including a formula, pattern, compilation, program, devise, method, technique, or process" and therefore cannot be classified as trade secrets.  We are aware of no case law upholding a trade secret privilege with respect to financial information.  To the extent you have any authority supporting your position, please provide it to us in any response. As the one asserting trade secret protection, the burden is on your client to support the assertion of that privilege.  De La Torre v. Swift Transp. Co., 2014 WL 3695798, at *2 (E.D. Cal., July 21, 2014) (2:13-CV-1786 GEB)  ("[A] trade secret or commercially sensitive information must be 'important proprietary information' and the party opposing disclosure must make 'a strong showing that it has historically sought to maintain the confidentiality of this information.'")

We further note that information regarding the financial performance of Second Measure is particularly relevant in this case.  As you know, my client contends that Mr. Babineau and he were in a business partnership, that your client improperly expropriated the entire business for himself and reincorporated it under his own name as Second Measure, Inc., and that my client was damaged as a result.  The obvious measure of damages in such a case requires a valuation of Second Measure, because that is what we claim was taken from my client.

Finally, we believe that the objection is particularly unwarranted in a case where, as here, the Court has entered a protective order restricting the use of confidential information. It is generally not proper to instruct a witness not to answer a deposition question on the basis of an alleged trade secret where a protective order has been entered by the court. Klein v. King, 132 F.R.D. 525, 531 (N.D. Cal. 1990) ("During depositions, counsel may instruct a witness not to answer *only* on grounds of privilege or work product (we assume that the protective order virtually eliminates any good faith basis for an instruction not to answer based on fear of disclosure of a trade secret)").

Please agree that we may reopen the 30(b)(6) deposition and that complete answers will be provided regarding the relevant deposition topic. Alternatively, we can discuss the provision of this information in writing.

## Chou Deposition

Please provide us with three possible dates for Chou's deposition during the second half of March or first half of April, other than March 16, 22-23, or April 4-8. We request that you do so in the next 5 business days. Also, we are open to holding the depo at your offices for the convenience of all parties, as the red tape at the Bank of America center can be a hassle for guests. Please let us know if you would like us to notice the depo at your offices and some dates when Ms. Chou will be available.

## Second Measure Interrogatory Responses

We believe that certain of your client's responses to our interrogatories were not adequate or that objections were improperly asserted.

## Interrogatory No. 3

This interrogatory asks "If you contend that Second Measure, Inc., the plaintiff in this action, is a materially different business organization from the partnership/joint venture alleged by Mr. Kim in his counterclaim to have existed as of September 2014, identify all facts and documents, if any exist, supporting that contention."

Second Measure objected to the interrogatory on the basis, among others, that it was vague and ambiguous with respect to the phrase "materially different business organization." Second Measure then adopted its own hyper-strict interpretation of the phrase "materially different business organization" to mean "materially different legal entity" and provided the simple response that "Second Measure Inc is a Delaware Corporation, while Project Recon was allegedly a partnership or joint venture."

We believe this response was improper and designed to avoid the obvious meaning of the interrogatory. As you know, the Federal Rules of Civil Procedure require you, in responding to an interrogatory, to "exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in interrogatories." Pulsecard, Inc. v.

Discover Card Services, Inc., 168 F.R.D. 295, 310 (D. Kan 1996). We respectfully submit that you have not done so. A key issue in this case is whether Second Measure is a mere continuation of the business partnership between Mr. Kim and Mr. Babineau, wrongly incorporated by Mr. Babineau in his own name. Although we believe that the meaning of the interrogatory should have been clear, by this letter we hereby clarify the interrogatory. We want an explanation of the basis on which your client contends that Second Measure is not a mere continuation of the business he had with Mr. Kim by describing how the current Second Measure differs in terms of (i) products or services offered, (ii) actual or anticipated customer or client base, and (iii) anticipated or actual manner of making a profit. We request that you serve an amended response on or before March 15, 2016.

Interrogatory No. 5

This interrogatory states "Identify all current and former paying customers or clients of Second Measure and describe, broken down monthly, all funds received to date from each of those clients or customers."

Second Measure refused to provide this information, citing a trade secrets privilege. We don't think that objection is warranted here. Note also that a protective order has been entered in this case. Please see the explanation above regarding the scope of trade secret protection. To the extent you have any case law supporting the assertion of the trade secret privilege in these circumstances, we request that you provide us with those authorities.

**Interrogatories to Chou**

Interrogatory No. 10

This interrogatory states: "With respect to Ms. Chou's claim for back wages against Mr. Kim, (i) the date Mr. Kim hired Ms. Chou, (ii) her position or title, (iii) any agreed-upon compensation, (iv) the identity of her supervisor(s) during her employment by Mr. Kim, (v) the date of her termination, if any, and whether said termination was with or without cause, and (vi) any documents evidencing any employer-employee relationship between Mr. Kim and Ms. Chou if any, including but not limited to any offer letters, statements regarding benefits, employee handbooks provided to her by Mr. Kim, letters of acceptance, resignation letters, etc."

Although we contend that it is plainly obvious what this interrogatory is seeking, Ms. Chou responded by refusing to answer, claiming that the interrogatory was unintelligible and did not ask a question. This is not a proper response. Again it was plainly obvious what the interrogatory was seeking, and it was not appropriate for Ms. Chou to seize upon a hyper-technicality to avoid responding. However, to move the process forward,

we hereby clarify that the word "identify" is missing and should be placed right before "(i)" in the interrogatory.  We request an amended response or before March 15, 2016.

Interrogatory No. 11

This interrogatory states: "With respect to the allegation in Paragraph 46 of the Chou Counterclaim that "Mr. Kim failed to pay Ms. Chou her wages earned and unpaid within 72 hours from the time of her separation", identify the reason(s) for her separation, and identify the exact date of Ms. Chou's separation and the amount of wages allegedly due and unpaid as of that date."

Ms. Chou did not respond to the interrogatory, claiming she has made no calculation of these amounts.  All of the information needed to answer this interrogatory is in the possession of Ms. Chou.  There is no excuse for her to refuse to answer simply because she does not want to make the calculations at this time.  We request an amended answer on or before March 15, 2016.

This letter is without waiver of Mr. Kim's rights regarding other discovery requests, which are expressly reserved.

Very truly yours,

Thomas V. Christopher
The Law Offices of Thomas V. Christopher
Attorneys for Steven Kim